J-A14019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
   :   PENNSYLVANIA
   :
   :
v.   :
   :
   :
   :
HANEF WILKINS   :
   :
Appellant   :   No. 2948 EDA 2023

Appeal from the Judgment of Sentence Entered October 6, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008007-2021

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
   :   PENNSYLVANIA
   :
   :
v.   :
   :
   :
   :
HANEF WILKINS   :
   :
Appellant   :   No. 2949 EDA 2023

Appeal from the Judgment of Sentence Entered October 6, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008013-2021

BEFORE:   PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:      **FILED SEPTEMBER 23, 2025**

Appellant Hanef Wilkins appeals from the judgment of sentence imposed

after a jury convicted him of third-degree murder and criminal conspiracy at

Docket No. 8007-2021,[1] and criminal conspiracy, possessing an instrument of

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(c) and 903, respectively.

crime (PIC), possession of a firearm without a license, possession of a firearm in Philadelphia, and two counts of aggravated assault, at Docket No. 8013-2021.[2,3]  On appeal, Appellant challenges the sufficiency and weight of the evidence, the trial court's evidentiary rulings, and claims that the trial court erred in denying a motion for a mistrial.  After careful review, we affirm on the basis of the trial court's opinion.

The facts of the case are well known to the parties.  **See** Trial Ct. Op., 8/16/24, at 1-17.  Briefly, on October 4, 2018, at approximately 8:00 P.M., there was a shooting at a gas station on the 2400 block of West Passyunk Avenue in Philadelphia.  Appellant, Yameen Mofield, Khalid Nyheem Harrison, and Markell Davis were identified as the shooters, and Appellant and Mofield were affiliated with the 31st Street gang.  The shooting resulted in the death of one minor, R.B., and wounding of two additional minors, K.B. and Q.B.[4] The victims were alleged to be affiliated with the 27th Street gang, and there was a history of back-and-forth violence between the two rival gangs.  **See id.** Following a jury trial, Appellant was convicted of the aforementioned crimes.  The trial court sentenced Appellant to an aggregate term of forty-five to ninety years of incarceration.  **See id.** at 19.

---

[2] 18 Pa.C.S. §§ 903, 907(a), 6106(a)(1), 6108, and 2702(a), respectively.

[3] The appeals were consolidated *sua sponte* pursuant to Pa.R.A.P. 513.  **See** Order, 7/31/24.

[4] All three victims were juveniles, and the trial court identified the victims by their initials.  **See** Trial Ct. Op., 8/16/24, at 1.

Appellant filed post-sentence motions, which the trial court denied, and Appellant filed a timely notice appeal. Appellant filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and the trial court filed a Rule 1925(a) opinion in response.

On appeal, Appellant raises the following issues:

1. Was the evidence insufficient to convict Appellant of murder in the 3rd degree and related charges for the killing of R.B., and aggravated assault and related charges as to the shooting of K.B. and Q.B. as there was insufficient evidence to prove beyond a reasonable doubt that Appellant committed either offense?

2. Did the trial court abuse its discretion by not finding that the guilty verdicts entered against . . . Appellant were against the weight of the evidence?

3. Did the trial court err by granting the Commonwealth's motion to admit other acts permitting the jury to hear that almost one year prior to the killing of R.B., Appellant was in possession of a firearm not connected to the charges in this case, and that eighteen months after the killing of R.B. that Appellant was in a stolen vehicle, where firearms were recovered, and [Appellant was] shot at another location in Philadelphia by unknown individuals?

4. Did the trial court err by not granting a mistrial after the prosecution called Khalid Nyheem Harrison, an alleged co-conspirator in the killing of R.B. who previously pled guilty to killing R.B., to testify about his involvement in the killing of R.B. and after Harrison refused to testify, specifically referenced Harrison's guilty plea referencing that he killed R.B. with Appellant and Mofield?

Appellant's Brief at 3 (some formatting altered).

Following our review of the record, the parties' briefs, and relevant legal authority, we affirm on the basis of the trial court's opinion. ***See*** Trial Ct. Op.,

- 3 -

8/16/24, at 1-61.[5] The trial court set forth the correct standards of review for each issue, thoroughly addressed Appellant's claims of error, and concluded that Appellant was not entitled to relief. **See id.** For these reasons, we affirm based on the trial court's well-reasoned opinion.[6]

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/23/2025

---

[5] As noted above, Appellant was convicted of 18 Pa.C.S. § 6108. Recently, a panel of this Court concluded that Section 6108 was unconstitutional as applied to the appellant in that matter. **See Commonwealth v. Sumpter**, ___A.3d___, ___, 2025 PA Super 124, 2025 WL 1743218, at *8 (Pa. Super. filed June 23, 2025). As a new rule of law, the **Sumpter** decision applies retroactively to cases pending on direct appeal so long as the issue was preserved at all stages of adjudication. **See Commonwealth v. Grooms**, 247 A.3d 31, 37 n.8 (Pa. Super. 2021). Here, Appellant did not challenge the constitutionality of Section 6108. Therefore, Appellant has not preserved this issue, and we are constrained to find it waived in this appeal. **See id.**

[6] The parties are directed to attach a copy of the trial court's opinion in the event of further proceedings.

- 4 -

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

Commonwealth of Pennsylvania

v.

Hanef Wilkins

FILED

AUG 1 6 2024

Appeals/Post Trial:
Office of Judicial Records

:
.  CP-51-CR-0008007-2021
:  CP-51-CR-0008013-2021

SUPERIOR COURT NO:
2948 EDA 2023
2949 EDA 2023

:

OPINION

Ehrlich, J.

Hanef Wilkins, hereinafter referred to as "Appellant," was found guilty by a jury on June 21, 2023, of Murder of the Third Degree, Conspiracy, Aggravated Assault, Possessing Instruments of Crime, and two (2) violations of the Uniform Firearms Act. This Court subsequently sentenced Appellant to an aggregate term of forty-five (45) to ninety (90) years of confinement. Appellant timely appealed his judgment of sentence, challenging the sufficiency and weight of the evidence, the admission of other acts evidence, and the denial of his motion for a mistrial following a Commonwealth witness's refusal to answer questions. Appellant's claims are without merit and no relief is due.

Statement of Facts

On October 4, 2018, at around 8:00 p.m., three (3) minors – R.B., K.B., and Q.B. – were shot at a gas station on 2435 West Passyunk Avenue in Philadelphia. R.B. died from a gunshot wound he sustained. Video footage of the shooting showed at least two (2) shooters who arrived at the gas station in a vehicle and fled after shooting. Police connected this shooting to a series of

1

back-and-forth shootings between the 27th Street gang and the 31st Street gang, rival gangs in South Philadelphia. An individual associated with 31st Street ultimately cooperated with police and gave a statement identifying Appellant, Yameen Mofield, Khalid Harrison, and Markell Davis as the individuals involved in the shooting. Police were able to determine that Appellant and Mofield were both affiliated with the 31st Street gang and corroborate various details given in the cooperator's statement.

Appellant was subsequently arrested and charged with Murder,[1] two (2) counts of Attempted Murder,[2] two (2) counts of Conspiracy to Commit Murder,[3] two (2) counts of Aggravated Assault,[4] Possessing Instruments of Crime ("PIC"),[5] and two (2) violations of the Uniform Firearms Act: Firearms Not to Be Carried Without a License ("VUFA § 6106"),[6] and Carrying Firearms on Public Streets or Public Property in Philadelphia ("VUFA § 6108").[7] Appellant was tried alongside Yameen Mofield. At trial, the Commonwealth presented twenty-two (22) witnesses as part of its case-in-chief against Appellant and Mofield. The evidence and testimony given at trial are summarized below.

Philadelphia Police Sergeant Carmen Palmiero testified that he was at the Philadelphia Police First District at around 8:00 p.m. on October 4, 2018, when a young black male, later identified as K.B., ran into the lobby bleeding and claimed that he had been shot at a gas station. At the same time, police received multiple calls reporting a shooting at 25th and Passyunk. Sergeant Palmiero subsequently responded to the gas station at 2435 West Passyunk Avenue,

---

[1] 18 Pa.C.S.A. § 2502.
[2] 18 Pa.C.S.A. § 901(a).
[3] 18 Pa.C.S.A. § 903(c).
[4] 18 Pa.C.S.A. § 2702(a).
[5] 18 Pa.C.S.A. § 907(a).
[6] 18 Pa.C.S.A. § 6106(a)(1).
[7] 18 Pa.C.S.A. § 6108.

2

located around the corner from the First District. Upon arrival, Sergeant Palmiero was directed to the rear of the gas station, where he found an unresponsive black male on the ground covered in blood. Sergeant Palmiero and his partner immediately transported the male, later identified as fifteen-year-old R.B., in the back of their police vehicle to Presbyterian Hospital. R.B. was pronounced dead at the hospital at 8:35 p.m. Jacqueline Nichols testified that R.B. was her grandson, born on March 19, 2003, and that she last saw him alive on October 3, 2018, when he visited her at her house. N.T. 6/12/2023, at 81-86; N.T. 6/20/2023, at 23-25.

Philadelphia Police Detective Ralph Domenic testified that he was assigned to investigate R.B.'s murder. Detective Domenic went to the scene of the murder and was able to recover video footage from the gas station where the murder occurred. The Commonwealth and counsel for Appellant and Mofield stipulated that video was recovered from the gas station at 2435 West Passyunk Avenue and surrounding areas which depicted the shooting on October 4, 2018. N.T. 6/12/2023, at 90-91; N.T. 6/13/2023, at 4-6, 12-15.

Philadelphia Police Detective Thorsten Lucke, an expert in digital surveillance, video recovery, and analysis, testified that he created a compilation of video footage of the shooting. The footage showed a vehicle traveling westbound and pulling up to the gas station, shooting at individuals who could be seen standing around the gas station, then traveling west toward 25th Street after the shooting concluded. A slowed-down and zoomed-in version of this same footage showed an individual leaving the shooting vehicle through the front passenger side door and a second individual inside the vehicle by the passenger side rear door. Visible muzzle flashes and disturbances captured by the infrared cameras indicated that both individuals were sources of gunfire. This footage also showed an individual with a gun running and reentering the vehicle prior to the vehicle driving away. Detective Lucke testified that police were unable to obtain any

3

additional footage which showed the continued path of travel for the vehicle involved in the shooting. N.T. 6/12/2023, at 90-106, 109-124.

Philadelphia Police Officer Terry Tull testified that at 9:45 p.m. on October 4, 2018, he assisted with processing the scene at 2435 West Passyunk Avenue. Officer Tull testified that several pieces of physical evidence were recovered from the scene, including ballistic evidence, swabs of blood stains, a black book bag, and a black hooded sweatshirt. All recovered evidence was placed on a property receipt and submitted for further analysis. Detective Lucke testified that he was asked to reexamine the video footage to locate an object consistent with the recovered book bag. Detective Lucke explained that the video footage initially did not appear to show anything on the ground where the bag was ultimately found, but that it showed an item consistent with the recovered bag after the shooting occurred and the vehicle fled the scene. This item then remained in place until it was recovered by police. N.T. 6/13/2023, at 117-138; N.T. 6/15/2023, at 17-30.

Dr. Lindsay Simon, an expert in forensic pathology, testified that on October 5, 2018, she performed an autopsy on R.B. Dr. Simon concluded that R.B.'s cause of death was a gunshot wound of the torso and that the manner of his death was homicide. Dr. Simon testified that the gunshot entered through the left side of R.B.'s back and exited through the left side of his chest, perforating two (2) of his ribs, his aorta, and multiple areas of his heart. Based on the lack or stippling on R.B.'s body, Dr. Simon estimated that the gun was fired at least two (2) to three (3) feet away. N.T. 6/15/2023, at 5-16.

On October 5, 2018, the day after the murder, Detective Domenic received information that some statements were made during the execution of a search warrant at Yameen Mofield's residence which potentially implicated him in the murder. The Commonwealth and counsel for

4

Appellant and Mofield stipulated that while Philadelphia Police Officer Matthew York was executing a search warrant at 2832 Aramingo Avenue, Mofield's mother asked if Mofield had anything to do with what happened at the gas station the day before, which would have been October 4, 2018. N.T. 6/12/2023, at 125-133; N.T. 6/13/2023, at 15-18.

On October 6, 2018, Detective Domenic interviewed the second shooting victim, K.B., at Penn Presbyterian Hospital, where he was being treated for a gunshot wound. K.B. told Detective Domenic that he saw a white vehicle pull up and, although he could not give specific information about the shooters, stated there were two (2) people shooting. Through his continued investigation, Detective Domenic was able to identify five (5) individuals, all under the age of eighteen (18), who were present at the gas station at the time of the murder: R.B., K.B., M.B., Q.B., and Q.R. Detective Domenic made several unsuccessful attempts to interview M.B., Q.B., and Q.R. N.T. 6/13/2023, at 18-27.

Detective Domenic learned that Q.B., who had been shot at the gas station, was being sought by the police at the time the shooting had occurred. Q.B. testified that he was with R.B. and K.B. at the gas station at 25th and Passyunk when R.B. was killed and K.B. was shot. Q.B. showed a graze wound on his right arm but testified that he could not remember if it happened while he was running from the gunfire that night. Q.B. also testified that he did not see who shot at them. *Id.* at 16-17, 50-57.

Detective Domenic testified that on October 18, 2018, Philadelphia Police Officer Christopher Lai gave him the names of several possible suspects for the murder: Yameen Mofield, Nyseem Smith, and Kameron Purnell. Officer Lai testified that he was assigned to the Seventeenth Police District in South Philadelphia for almost fifteen (15) years and knew many people from the neighborhood from his time patrolling there, including R.B.'s family and Q.B's

5

family. In 2016, Officer Lai helped police determine that shootings occurring in the Grays Ferry area were related to two (2) groups. Multiple reports compiled from recovered firearms and fired cartridge casings showed a pattern of back-and-forth shootings on 27th Street and 31st Street. Based on conversations with people in the neighborhood and social media posts he found, Officer Lai determined that there were two (2) gangs – one representing 27th Street and the other representing 31st Street – which had come into conflict with each other. *Id.* at 18-23, 57-71.

Officer Lai testified that he began monitoring gang activity on social media and found that members of both gangs were active on Instagram and YouTube. Officer Lai identified Instagram accounts belonging to Appellant and Mofield, both of which had usernames that referenced 31st Street. Officer Lai recognized numerous individuals who were associated with the 31st Street gang, including Appellant, Mofield, Khalid Harrison, Nyseem Smith, Kameron Purnell, Jhaquil Eguilar, Tymeir Shands, and Troy Norman. Officer Lai testified that in the process of investigating the Grays Ferry shootings, police began recovering stolen vehicles used in these shootings close to the home addresses of the known 31st Street gang members. Officer Lai testified that he knew the nicknames used by individuals associated with the 31st Street gang, identifying Appellant's nickname as "Nu" or "Nuski" and Mofield's nickname as "Su" or "Su-Su." *Id.* at 69-88.

On December 5, 2018, Detective Domenic interviewed Dean Fosque after learning that Fosque had information regarding the murder of R.B. Dean Fosque confirmed that he was questioned by homicide detectives on that date, but stated that the questioning was not recorded and that he was not asked to review or sign a statement afterward. Police wrote in a statement that Fosque had stated "that his cousin, who he identified [as] Yuseem, a.k.a. 'Su Su', told him that he (Yuseem) did a murder at the gas station on Passyunk near Wilson Park Projects a few

6

months back." Fosque testified that when questioned in front of a grand jury on March 11, 2021, he stated that he knew a "Yameen" who went by the nickname Su-Su. Fosque told the grand jury that Su-Su had tried selling him a stolen car on Instagram, that Su-Su was on the run at this time, and that he had heard that Su-Su had committed a homicide. Fosque denied giving any of these details to the grand jury and failed to correctly identify Su-Su in the courtroom. *Id.* at 7-8; N.T. 6/12/2023, at 134-149, 153-168.

According to Detective Domenic, Fosque stated that Yameen Mofield had told him that he was involved in the murder on Passyunk Avenue. Fosque told Detective Domenic that Mofield was trying to sell him a stolen car so he could have enough money to get out of town because he had seen himself on the news in connection with the murder. Mofield told Fosque that he was the individual wearing a hood chasing a boy in the video footage, but that he would not be able to be identified because of the hood. Detective Domenic testified that Fosque also positively identified a photo of Mofield. N.T. 6/13/2023, at 7-12, 30-46.

Agent Christopher Marano, the Section Director of the Gun Violence Task Force in the Pennsylvania Attorney General's Office, testified that he led an investigation into the rivalry between 27th Street and 31st Street in South Philadelphia which put him into contact with Nyseem Smith. Smith testified that he grew up near 31st Street and Tasker Street and that people from 31st Street had "beef" with people from 27th Street. Smith testified that people from 31st Street and 27th Street shot at each other because of this beef and that's "just how it was." Smith testified that he later got involved with this conflict and that he and his friends from 31st Street would share guns and use them while driving stolen cars through 27th Street territory. Smith and his friends would shoot back at anyone who shot at them and would also target someone that they spotted. N.T. 6/13/2023, at 142-165; N.T. 6/15/2023, at 75-79.

7

Smith testified that he and his friends from 31st Street were active on social media and that they would sometimes make music videos which attacked 27th Street. Smith stated that most of the people present in these music videos were 31st Street gang members and specifically identified Yameen Mofield and Khalid Harrison in a screenshot taken from one of these music videos. Smith also identified numerous individuals seen in photographs posted to Instagram, including Jhaquil Eguilar, Khalid Harrison, Mujihad Dean, Saheem Tart, Aquil Collins, Omar Wright, Tymeir Shands, Justin Price, Kameron Purnell, Javon Parris, Appellant, and himself. Smith testified that these individuals were connected to 31st Street and that he had committed shootings and traded guns with some of them. Smith identified both Mofield and Appellant in the courtroom. Smith stated that Appellant was younger than him but that they sometimes hung out and that he also sometimes hung out with Mofield. *Id.* at 165-174; N.T. 6/14/2023, at 6-23.

Smith admitted that he was arrested various times in 2015, 2016, and 2018 in connection with firearms and stolen vehicle charges. Smith testified that in August 2018, he committed a triple shooting with Jhaquil Eguilar and Khalid Harrison on the 1600 block of Marston Street. Smith testified that he was in a stolen vehicle acting as a lookout for police and that he identified the targets that Eguilar and Harrison shot at from another stolen vehicle. Smith continued to drive the stolen vehicle the day after the shooting but observed the police recovering the vehicle later that day. Smith was questioned by Officer Lai about the vehicle, but Smith denied having any involvement. Smith's DNA was later detected on a sweatshirt left in the vehicle and the steering wheel of the vehicle. N.T. 6/14/2023, at 23-31, 130-136, 146-149, 156-159.

Officer Lai testified that he assisted with the investigation into this triple shooting, in which the occupants of a stolen Buick Verano drove alongside another vehicle in which four (4) members of the 27th Street gang were sitting and fired numerous gunshots into the vehicle.

8

Three (3) of the 27th Street gang members were struck while the fourth was able to flee the vehicle. Officer Lai testified that police were able to identify the stolen Buick Verano used in this shooting and recovered it the following day near 22nd Street and Passyunk Avenue. N.T. 6/13/2023, at 88-91.

Smith testified that he was arrested on March 6, 2019, in relation to the Marston Street triple shooting. At the time he was arrested, Smith was in possession of a Glock .40, which he stated had been used in a shooting near 2200 Point Breeze Avenue the previous night. While in custody, Smith decided it was in his best interest to cooperate with the Commonwealth and the Pennsylvania Attorney General's Office. Following a proffer session, Agent Marano ultimately decided to take formal statements from Smith. From 2019 to 2021, Agent Marano received approximately fifteen (15) to twenty (20) statements from Smith in which Smith gave accounts that implicated himself and others in multiple 31st Street gang-related shooting incidents. Smith testified that he had to sign a cooperation agreement and that he was advised that if he did not abide by the terms of the agreement, he would potentially be subject to a sentence of life imprisonment. Smith ultimately pled guilty to multiple criminal offenses, including conspiracy, aggravated assault, and firearms charges, in twelve (12) different cases. Smith testified that he was offered a sentence of five (5) to twenty (20) years of confinement in exchange for his cooperation. *Id.* at 31-35 101-118, 121-128, 159-161, 207-209; N.T. 6/15/2023, at 79-82.

Smith confirmed that he gave a series of statements to police in which he revealed details of shootings that the 31st Street gang was involved in, much of which was previously unknown to police. One of the statements that Smith gave was regarding the Marston Street triple shooting for which he had been arrested. Philadelphia Police Detective Andrew Gallagher, who responded to the Marston Street triple shooting, testified that he later became aware of Smith's statement

9

and stated that it revealed details previously unknown to police. N.T. 6/14/2023, at 95-96; N.T. 6/15/2023, at 140-142.

Particularly, Smith revealed that he was in a black vehicle in front of the silver Buick Verano which committed the shooting. Detective Gallagher testified that he initially did not know about this black vehicle's involvement and was able to confirm its presence upon reviewing footage from the shooting. Smith also revealed that he was in the black vehicle with Eric Woodard and Woodard's girlfriend, which was consistent with other information Detective Gallagher had seen. Smith identified Jhaquil Eguilar and Khalid Harrison as the shooters in the Buick Verano. Detective Gallagher testified that phone records for Harrison's cell phone showed movement consistent with this information and that Eguilar was observed inside a barbershop next to where the Verano was located the day after the shooting. N.T. 6/15/2023, at 142-149.

Smith additionally gave statements regarding a series of shootings that occurred from October 17, 2017, to July 16, 2020. Smith identified Khalid Harrison, Jhaquil Eguilar, Mujihad Dean, Tahkeam Williams, Saheem Tart, Hyfese Richardson, Eric Woodard, Tymeir Shands, and himself as 31st Street gang members who participated in these shootings, which were largely committed using stolen vehicles and targeted at known members of the 27th Street gang. Smith agreed that he was personally involved in shooting incidents where a total of nineteen (19) people were shot at, and that he was involved in a shooting on December 19, 2017, which resulted in the death of Nasir Livingston. N.T. 6/14/2023, at 31-39, 64-104, 136-174.

Smith gave a signed statement regarding the shooting of sixteen-year-old J.W.H. which occurred on October 18, 2017, around 8:00 p.m. near the 1400 block of South Etting Street. Philadelphia Police Detective Michael Ferry testified that J.W.H., a member of the 27th Street gang, was shot multiple times. Ballistic evidence and video footage recovered from the crime

10

scene indicated that four (4) individuals were involved. Smith, who was on house arrest at the time of the shooting, testified that Khalid Harrison and Jhaquil Eguilar came to his home and discussed the shooting. Agent Marano testified that he investigated the Etting Street shooting and determined that four (4) firearms were used to shoot J.W.H. Three (3) days after this shooting, Appellant was arrested while in possession of one of the guns that had been used in the shooting. Agent Marano later found communications on Instagram between Tahkeam Williams, who was identified as one of the shooters, and Yameen Mofield from October 2017 in which they discussed being armed and preparing to shooting someone. N.T. 6/13/2023, at 95-103; N.T. 6/14/2023, at 35-39; N.T. 6/15/2023, at 102-110.

Smith also gave a signed statement regarding the murder of R.B. on October 4, 2018, at 2548 Passyunk Avenue. Smith stated that on the night of the murder, he was with his cousin Devon Jacobs, Javon Parris, and Tymeir Shands at Jacobs' house at 1600 Napa Street. Smith testified that after the shooting, Khalid Harrison, Yameen Mofield, Appellant, and another person came to the house. Smith did not know the fourth person but identified him in his statement to police as "a young boy named Markell." Harrison, Mofield, and Appellant told Smith and the others present that somebody had been shot and killed at a gas station on Passyunk. N.T. 6/14/2023, at 39-45, 48-49, 200.

Mofield told the group that they had rode through Wilson Park and "saw Jameir pumping gas at the gas station" as they were coming out. Mofield then said that they spun around and found Jameir gone, but that they still started shooting when they saw a couple other people from Wilson. Mofield said that he started chasing "Naseem's little brother" and that he knew he hit him with his gun. Additionally, Mofield stated that he had dropped his phone at the scene. Smith told police in his statement that Harrison had a PPX9 handgun, Mofield had a .9 Taurus pistol,

11

and Appellant had a .38 revolver, and that he did not know if Markell had a gun. Smith later positively identified a photograph of Markell Grasty that was shown to him by police. Smith told police that the PPX9 had been previously used in the Marston Street triple shooting that he was involved in. Smith also told police that he had watched a video of the shooting on Instagram and was able to identify Mofield as the individual seen jumping out of a white vehicle with his face covered and chasing somebody. *Id.* at 45-64.

Agent Marano confirmed that Smith gave a statement in February 2020 regarding the murder of R.B. Agent Marano reviewed the call detail records for Smith's cell phone and verified that Smith had been present at 1600 South Napa Street at the time the murder occurred. Based on Smith's information that a PPX9 had been used in the homicide and that it had been used in other shootings too, Agent Marano ordered that the ballistic evidence recovered from the homicide at 2548 Passyunk Avenue be crosschecked with ballistic evidence recovered from 1600 South Marston Street and two (2) other shootings. N.T. 6/15/2023, at 82-90.

Natalie Murphy, an expert in firearms identification and analysis, testified that she analyzed sixteen (16) 9mm Luger fired cartridge casings and five (5) bullet specimens recovered from the murder investigation at 2435 West Passyunk Avenue. Ms. Murphy's ballistic analysis revealed that the first eight (8) fired cartridge casings were fired from a single firearm while the other eight (8) fired cartridge casings were fired from a separate firearm. Ms. Murphy testified that the five (5) bullet specimens consisted of one (1) intact bullet and four (4) bullet jackets. Ms. Murphy concluded that the intact bullet and bullet jacket 1 were from the .38 or 9mm family of caliber, and that bullet jackets 2 and 4 were fired from the same firearm. Ms. Murphy confirmed that she was requested to conduct a crosscheck against ballistic evidence recovered from other shootings. This crosscheck revealed that the same firearm was used to fire both a group of fired

12

cartridge casings recovered from 1600 South Marston Street and the first group of fired cartridge casings recovered from 2435 West Passyunk Avenue. *Id.* at 38-57.

Based on information in Smith's statement that Appellant, Yameen Mofield, Khalid Harrison, and Markell Grasty were present at R.B.'s murder, Agent Marano reviewed call detail records for Appellant, Mofield, and Harrison. Agent Marano testified that he received location data for Mofield and Harrison's cell phones which placed them both in the area of the murder at the time it occurred, but that he was unable to retrieve location data for Appellant's cell phone. Agent Marano investigated Smith's claim that a phone had been dropped at the scene of the murder and determined that the only phone recovered from the scene belonged to one of the shooting victims. *Id.* at 90-102, 111-113, 126-127.

Amanda McCourtie, a digital forensic analyst with the Philadelphia District Attorney's Office, testified as an expert in cell site analysis, cell phone extraction and analysis, and social media extraction and analysis. Ms. McCourtie stated that she first assisted with the investigation into R.B.'s murder by reviewing posts that had been made on the Instagram page for "No Gun Zone Philadelphia," which included an image of R.B., a screenshot from a news report about the case, and message sent to the page reporting gunshots at the 24th and Passyunk gas station. Based on these posts, Ms. McCourtie was ultimately able to find a video capturing the shooting posted to the Philadelphia Inquirer YouTube page. N.T. 6/16/2023, at 57-78.

Ms. McCourtie testified that she was next tasked with looking into Markell Grasty and was provided with an extraction of a cell phone associated with Grasty. From this extraction, Ms. McCourtie found pictures of Grasty holding firearms, videos of Grasty, videos of Yameen Mofield, and a video of Grasty and Mofield together. Ms. McCourtie analyzed the connections between the phone number associated with Grasty's phone and phone numbers associated with

13

Appellant, Mofield, and Khalid Harrison, and determined that there were communications between the numbers belonging to Appellant, Mofield, and Harrison, but that Grasty only had communications with Mofield. Ms. McCourtie additionally determined that Grasty followed both Appellant and Harrison on Instagram and had communicated numerous times with Mofield on Instagram. *Id.* at 78-88.

Ms. McCourtie further testified that she reviewed the contents of Mofield's Instagram account and found messages sent from Mofield's Instagram account which showed that he was using the same phone number both before and after the shooting. Ms. McCourtie conducted cell site analysis on that phone number and phone numbers associated with Appellant, Harrison, and Nyseem Smith. The cell site analysis on Smith's phone revealed that numerous calls were made from 7:20 p.m., shortly before the homicide, until 8:28 p.m., shortly after the homicide. All of these calls utilized the same cell tower which was consistent with the phone remaining stagnant and being used at 1600 South Napa Street. *Id.* at 89-100.

The cell site analysis on Mofield's phone revealed that the phone used a cell tower approximately two (2) miles west of the shooting location at 7:35 p.m. At 8:10 p.m. and 8:12 p.m., Mofield's phone used the sector of a cell tower pointing in the direction of the shooting. At 8:11 p.m. and 8:15 p.m., Mofield's phone used a different cell tower which still pointed in the direction of the shooting. From 9:13 p.m. to 9:31 p.m., Mofield's phone used the same cell tower, which pointed in the direction of 1600 South Napa Street. Calls that were placed on Mofield's phone from 10:23 p.m. to 11:38 p.m. and the following morning used cell towers near 2832 Aramingo Avenue, Mofield's residence at the time. Ms. McCourtie agreed that the call detail records for Mofield's phone showed that it was used to place numerous calls both before and after the murder. *Id.* at 100-108, 130-138.

14

Ms. McCourtie found messages on Appellant's Instagram account from the morning of the homicide in which he stated that he was going to King of Prussia with Khalid Harrison. Cell site analysis of Harrison's phone revealed that a call made at 11:43 a.m. used cell towers pointing toward Morris Street in South Philadelphia and that calls made from 12:58 p.m. to 1:00 p.m. used cell towers moving toward the King of Prussia area. Calls made from 2:31 p.m. to 2:34 p.m. placed Harrison's phone in the King of Prussia area. A call made at 3:19 p.m. placed Harrison's phone closer to the Conshohocken area and a call made at 4:10 p.m. used cell towers closer to the shooting location in Philadelphia. The last calls made on Harrison's phone prior to the shooting at 7:26 p.m. and 7:27 p.m. used a cell tower with the shooting location in the range. Another call was not made until 8:14 p.m. using a cell tower near Fairmount Avenue and West Girard Avenue, followed by a call at 8:26 p.m. using a cell tower near 1714 North 16th Street, an address associated with 31st Street member Troy Norman. *Id.* at 108-119.

Ms. McCourtie testified that the cell detail records for Appellant's phone showed several calls to and from Harrison's phone from 7:16 a.m. to 10:31 a.m. on the day of the shooting. There were no call activities on Appellant's between 7:23 p.m. and 8:48 p.m. Ms. McCourtie noted that there were similarly no call activities on Mofield's phone between 7:35 p.m. and 8:10 p.m. and no call activities on Harrison's phone between 7:27 p.m. and 8:14 p.m. The shooting took place at approximately 8:00 p.m. *Id.* at 119-122.

Ms. McCourtie testified that she noticed that one of the calls Harrison's phone made was to a state prison. Ms. McCourtie ultimately determined that the call was made to an inmate named Markell Davis, a 31st Street gang member. Ms. McCourtie listened to all of Davis's recorded prison tapes and testified that two (2) calls stood out to her. Ms. McCourtie recognized Harrison's voice on the first call. In this call, which was placed on October 4, 2018, the day of

15

the shooting, Harrison told Davis that he was out on Tasker Street with "Susu and Nunu," who he called "my young killers . . . my young gorillas, my young savages" who were "out here doing big things." *Id.* at 122-127; Comm. Exhibit 173.

Ms. McCourtie recognized the voice of Tymeir Shands, a 31st Street gang member, on the second call, which was placed on October 14, 2018, ten (10) days after the shooting. In this call, Shands stated that "young bull lil Su" was "on the run" for a "joint." Davis replied that he had been told about "one of them little young bul getting boxed in . . . at the gas station." Shands told Davis that Su was "on tour" for that and that "he said he dropped his phone out there." Shands added that "it was a good jawn . . . besides him dropping the phone." Shands also said to Davis that he had advised the others to "swap the nine." N.T. 6/16/2023, at 127-130, 138-143; Comm. Exhibit 174.

Craig Judd, an expert in the field of forensic DNA and analysis, testified that he conducted a DNA analysis for the Passyunk Avenue shooting on October 4, 2018. Mr. Judd testified that he conducted DNA analysis on a book bag and a hooded sweatshirt collected from the scene of the shooting. Mr. Judd used a blood card from R.B. and a buccal swab from Appellant as reference samples. Mr. Judd concluded that the DNA collected from the book bag was consistent with a mixture of partial DNA profiles originating from at least three (3) individuals, at least one of whom was male. The major component of the DNA mixture was consistent with originating from an unknown female. Results were inconclusive as to whether R.B. or Appellant contributed to the minor components of the DNA mixture. Mr. Judd also concluded that the DNA collected from the hooded sweatshirt was consistent with a mixture of partial DNA profiles originating from at least two (2) individuals, at least one of whom was male. R.B. was determined to be the source of the major component of the DNA mixture and

16

results were inconclusive as to whether Appellant contributed to the minor component of the DNA mixture. N.T. 6/15/2023, at 60-72.

Philadelphia Police Detective Robert Conway testified that he was the assigned investigator for a triple shooting that occurred on April 22, 2020, in the area of 5300 Greenway Avenue. Detective Conway testified that four (4) members of the 31st Street gang, including Appellant, left a recording studio and got into a Volkswagen Tiguan parked on 5300 Greenway Avenue. As soon as the four (4) individuals got into the Volkswagen, a white Jeep Grand Cherokee Jeep pulled alongside and opened fire at the occupants of the Volkswagen. Three (3) of the people in the car, including Appellant, were shot. Video footage showed Appellant exiting the Volkswagen from the driver's side after being shot and hopping away. Three (3) firearms were recovered, including a 9mm Glock handgun that was found lying on the street on the driver's side of the Volkswagen. Detective Conway testified that the Volkswagen had been stolen nine (9) days prior to the shooting. N.T. 6/13/2023, at 103-112, 115-116.

Philadelphia Police Detective Francesco Campbell testified that he was asked to obtain a DNA sample from Yameen Mofield, but that Mofield refused to give a DNA sample on multiple occasions. Supervisory Special Agent James Owens testified that an unsuccessful attempt to arrest Yameen Mofield was made at his last known residence on April 15, 2021. Agent Owens opened a fugitive case for Mofield two (2) days later. After Agent Owens subsequently learned that Mofield was in the area of Atlanta, Georgia, he generated a collateral lead which led to Mofield's arrest on May 13, 2021, in South Fulton, Georgia. The Commonwealth and counsel for Appellant and Yameen Mofield stipulated that neither Appellant nor Mofield had a valid license to carry a concealed weapon. N.T. 6/15/2023, at 31-36; N.T. 6/20/2023, at 17-23, 26.

17

## Procedural History

On March 16, 2023, the Commonwealth filed a motion *in limine* to admit other acts evidence of continued and sustained violence between warring gangs which would also establish that Appellant and Yameen Mofield were both associated with the 31st Street gang. The Commonwealth additionally sought to admit two (2) shootings which it contended showed a pattern of gun violence perpetrated by the 31st Street gang against the rival 27th Street gang leading up to the murder of R.B. On March 23, 2023, Appellant's counsel submitted a memorandum of law in opposition to the Commonwealth's motion *in limine*. On March 24, 2023, this Court held a hearing to decide the Commonwealth's motion *in limine* to admit other acts. This Court heard argument from the Commonwealth and counsel for Appellant and Mofield and ultimately held its decision under advisement. On March 30, 2023, this Court granted the Commonwealth's motion, allowing the other acts evidence to be admitted.

On March 29, 2023, the Commonwealth filed a second motion *in limine* to admit other acts evidence of two (2) prison phone calls made to inmate Markell Davis. On March 30, 2023, this Court held the Commonwealth's second motion *in limine* under advisement until it had an opportunity to review the transcripts of the recorded prison calls. This Court later granted the Commonwealth's motion *in limine,* allowing the two (2) prison phone calls to be admitted into evidence.

Appellant and Mofield's trial commenced on June 8, 2023. On June 21, 2023, after hearing all evidence, closing arguments from counsel, and jury instructions from this Court, a jury deliberated and found Appellant guilty of one (1) count each of Murder of the Third Degree, Conspiracy to Commit Murder of the Third Degree, Conspiracy to Commit Murder, VUFA § 6106, VUFA § 6108, and PIC, and two (2) counts of Aggravated Assault. N.T. 6/21/2023, at 10-

18

13. This Court ordered a presentence investigation report and a mental health evaluation for Appellant and deferred sentencing to a later date. *Id.* at 20.

This Court subsequently held a sentencing hearing for Appellant on October 6, 2023. Appellant's mother addressed this Court. N.T. 10/6/2023, at 45-49. The Commonwealth read into the record victim impact statements submitted by R.B.'s brother, sister, grandmother, uncle, aunt, and cousin. *Id.* at 14-20, 52-54. Both Lynn Nelson, R.B.'s other grandmother, and Jasmine Morris, R.B.'s mother, also addressed this Court. *Id.* at 20-34, 52. Appellant declined the opportunity to address this Court at his sentencing. *Id.* at 54-55.

Thereafter, this Court sentenced Appellant to a term of twenty (20) to forty (40) years of confinement on Appellant's Murder of the Third Degree conviction, followed by consecutive terms of twenty (20) to forty (40) years for Conspiracy to Commit Murder of the Third Degree and five (5) to ten (10) years for the first Aggravated Assault. *Id.* at 55-56. This Court additionally imposed concurrent sentences of five (5) to ten (10) years each for Conspiracy to Commit Murder and the second Aggravated Assault, three-and-a-half (3½) to seven (7) years for VUFA § 6106, and two-and-a-half (2½) to five (5) years each for VUFA § 6108 and PIC. *Id.* at 56. Appellant thus received an aggregate sentence of forty-five (45) to ninety (90) years of confinement. *Id.* at 57. This Court expressed its concerns with how Philadelphia had become so dangerous because of people like Appellant who "don't care about the value of the human life in the slightest" and choose to settle matters with guns, with "deadly consequences." *Id.* at 55-56.

On October 11, 2023, Appellant filed timely post-sentence motions and a memorandum of law in which he argued that the jury's verdict was against the weight of the evidence and that there was insufficient evidence to support the jury's verdict. On October 16, 2023, this Court denied Appellant's post-sentence motions without a hearing. On November 14, 2023, Appellant

19

filed a timely notice of appeal to the Superior Court of Pennsylvania. On November 16, 2023, this Court directed Appellant to file a 1925(b) Statement of Errors Complained of on Appeal, which Appellant subsequently filed on December 7, 2023.

On appeal, Appellant raises the following four (4) issues:

1. The evidence was insufficient to sustain verdicts of guilty on any of the counts for the following reasons:
   a. The only evidence that the Defendant was involved in shooting the victim, Q█████ B█████, came from a cooperating witness who alleged that the Defendant admitted after the homicide that he was involved, along with two individuals, Nyheem Khalid Harrison and Yameen Mofield, who were each armed with 9 mm handguns, and that the Defendant used a .38 caliber revolver to shoot the victim;
   b. The physical evidence collected from the crime scene consisted of fourteen (14) fired cartridge casings that were shot from two separate 9 mm handguns;
   c. The shooting of the victim was captured on video, and in it there are only two individuals who are seen shooting;
   d. The Commonwealth charged Nyheem Khalid Harrison, along with co-defendant Yameen Mofield, with the shooting of the victim, and Nyheem Khalid Harrison pled guilty as part of a negotiated plea to the shooting of the victim;
   e. The remaining factual bases for claiming the [evidence was insufficient] were set forth specifically in the Defendants Post-Sentence Motions, which were denied by the Trial Court.

2. The verdict was against the weight of the evidence as follows:
   a. The only evidence that the Defendant was involved in shooting the victim, Q█████ B█████, came from a cooperating witness who alleged that the Defendant admitted after the homicide that he was involved, along with two individuals, Nyheem Khalid Harrison and Yameen Mofield, who were each armed with 9 mm handguns, and that the Defendant used a .38 caliber revolver to shoot the victim;
   b. The physical evidence collected from the crime scene consisted of fourteen (14) fired cartridge casings that were shot from two separate 9 mm handguns;
   c. The shooting of the victim was captured on video, and in it there are only two individuals who are seen shooting;
   d. The Commonwealth charged Nyheem Khalid Harrison, along with co-defendant Yameen Mofield, with the shooting of the victim, and Nyheem Khalid Harrison pled guilty as part of a negotiated plea to the shooting of the victim;

20

e. The remaining factual bases for claiming the verdict was against the weight of the evidence were set forth specifically in the Defendants Post-Sentence Motions, which were denied by the Trial Court.

3. The Trial Court erred by granting the Commonwealth's Motions to Admit Other Acts Evidence, and admitting the following evidence:
   a. The admission of a shooting on August 8, 2018 at 1400 S. Etting Street committed by two members of the 31st Street gang, to which the Defendant allegedly belonged, and the subsequent recovery from the Defendant the following day of a firearm used in that shooting;
   b. The admission of the shooting of the Defendant and others by unknown individuals at 5300 Greenway Avenue on April 22, 2020, during which time three firearms were recovered;
   c. The admission of a recorded telephone call from a state prison facility from prisoner Markell Davis to Nyheem Khalid Harrison the morning of the homicide in which Harrison stated that he was with the Defendant and co-defendant, Yameen Mofield, in which he referred to them as "my young killers."

4. The Trial Court erred by not granting a mistrial after the Commonwealth called Nyheem Khalid Harrison to testify and he refused to answer any questions put to him, after which the Commonwealth read directly from Harrison's statement in which he allegedly inculpated the Defendant in the shooting of Q█████ B████.

Appellant's Pa.R.A.P. 1925(b) Statement of Matter (reordered).

## Discussion

### I. There was sufficient evidence for a jury to find Appellant acted with malice and convict him of Murder of the Third Degree and other related offenses.

Appellant claims that there was insufficient evidence to sustain any of his guilty verdicts relating to the murder of R.B. and the shooting of K.B. and Q.B. In support of his claim, Appellant contends that the only evidence implicating him came from a cooperating witness who stated that Appellant used a .38 caliber revolver in the shooting and that Yameen Mofield and Khalid Harrison used 9mm handguns. Appellant argues that the only ballistic evidence recovered was from two (2) separate 9mm handguns, that video footage only captured two (2) individuals shooting, and that Harrison separately pled guilty to his involvement in the shooting. Appellant

21

thus argues that three (3) individuals were convicted when there was only evidence of two (2) shooters. Appellant's first claim is without merit and no relief is due.

In reviewing a challenge to the sufficiency of the evidence, the standard of review is to "determine whether the evidence admitted at trial and all reasonable inferences therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt." *Commonwealth v. Palmer*, 192 A.3d 85, 89 (Pa. Super. 2018). This standard is equally applicable to cases where the evidence is circumstantial "so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Walker*, 836 A.2d 999, 1000 n.3 (Pa. Super. 2003). It is "within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence." *Palmer*, 192 A.3d at 89.

To prove a charge of Conspiracy, the Commonwealth must establish that a defendant: "(1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent, and (3) an overt act [was] done in furtherance of the conspiracy." *Commonwealth v. Beatty*, 227 A.3d 1277, 1283–84 (Pa. Super. 2020). Although the existence of an agreement to commit or aid in an unlawful fact is an "essential element of conspiracy, it is generally difficult to prove an explicit or formal agreement." *Commonwealth v. Spotz*, 716 A.2d 580, 592 (Pa. 1998). Such an agreement may therefore "be established inferentially by circumstantial evidence," including the relations, conduct, or circumstances of the parties. *Id.*

Circumstantial evidence of the "conduct of the parties and the circumstances surrounding such conduct may create a 'web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." *Commonwealth v. Irvin*, 134 A.3d 67, 76 (Pa. Super. 2016). Once a

22

conspiracy is established, the "actions of each co-conspirator may be imputed to the other conspirators." *Commonwealth v. Geiger*, 944 A.2d 85, 91 (Pa. Super. 2008). Each conspirator is considered criminally responsible under the law "for the actions of his co-conspirator, provided that the actions are accomplished in furtherance of the common design." *Commonwealth v. Baskerville*, 681 A.2d 195, 201 (Pa. Super. 1996). Such responsibility "extends even to a homicide which is a contingency of the natural and probable execution of the conspiracy, even though such homicide is not specifically contemplated by the parties." *Commonwealth v. Eiland*, 301 A.2d 651 (Pa. 1973).

Murder of the Third Degree is statutorily defined as "all other kinds of murder" other than Murder of the First Degree and Murder of the Second Degree. 18 Pa.C.S.A. § 2502(c). In effect, to convict a defendant of Murder of the Third Degree, the Commonwealth must prove "the killing of an individual with legal malice." *Commonwealth v. Jones*, 271 A.3d 452, 458 (Pa. Super. 2021). Malice is defined as "exhibiting an 'extreme indifference to life.'" *Commonwealth v. Ludwig*, 874 A.2d 623, 632 (Pa. 2005) (quoting *Commonwealth v. Young*, 431 A.2d 230, 232 (Pa. 1981)). Malice includes "not only particular ill will toward the victim, but also wickedness of disposition, hardness of heart, wantonness, and cruelty, recklessness of consequences, and conscious disregard by the defendant of an unjustified and extremely high risk that his actions may cause serious bodily harm." *Id.*

A person is guilty of Aggravated Assault if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A. § 2702(a). Serious bodily injury is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any

23

bodily member or organ." 18 Pa.C.S.A. § 2301. There is "no distinction between the malice essential to a third degree murder and that necessary" to commit Aggravated Assault. *Commonwealth v. Kling*, 731 A.2d 145, 147 (Pa. Super. 1999).

The Commonwealth presented ample evidence sufficient to convict Appellant of Murder of the Third Degree, Conspiracy to Commit Murder, and Aggravated Assault. The record established that R.B. was shot and killed at a gas station at 2435 West Passyunk Avenue around 8:00 p.m. on October 4, 2018. An autopsy conducted on R.B. revealed that he died from a gunshot wound to his torso and that the manner of his death was homicide. K.B. and Q.B. were also struck by gunfire during this shooting. K.B. initially ran from the gas station to the nearby Philadelphia Police First District to report that he had been shot and was subsequently treated at a hospital for a gunshot wound. Q.B. testified that he was at the gas station during the shooting and showed a graze wound he may have sustained during the shooting. N.T. 6/12/2023, at 81-86; N.T. 6/13/2023, at 18-27; N.T. 6/15/2023, at 5-17, 50-57.

Video footage recovered from the shooting showed one individual exiting a vehicle that pulled up to the gas station and firing gunshots while running and another individual firing gunshots from within the vehicle. Police were able to connect this shooting to a series of ongoing shootings between rival gangs in South Philadelphia, the 27th Street gang and the 31st Street gang. In December 2018, Dean Fosque told police that his cousin Yameen, who went by the nickname "Su-Su", was involved in the murder at the gas station on Passyunk Avenue a few months prior. Fosque positively identified a photograph of Yameen Mofield for police. N.T. 6/12/2023, at 90-113, 134-149; N.T. 6/13/2023, at 7-12; 50-88

Investigators working on R.B.'s homicide later came into contact with Nyseem Smith, who was part of the 31st Street gang. Smith explained how he and his friends from 31st Street

24

would drive stolen vehicles through 27th Street territory and use shared firearms to shoot at anyone they knew to be associated with 27th Street. Smith, who had been arrested for his participation in 31st Street related shootings, ultimately agreed to cooperate with investigators in exchange for a favorable prison sentence. Smith gave a series of statements about shootings in which the 31st Street gang was involved, including the homicide of R.B. N.T. 6/13/2023, at 142-174 ; N.T. 6/14/2023, at 6-128; N.T. 6/15/2023, at 75-82.

Smith stated that he was at his cousin's house when the gas station shooting occurred but that Appellant, Yameen Mofield, Khalid Harrison, and Markell Davis came to the house after the shooting. Appellant, Mofield, and Harrison told Smith and others present that somebody had been shot and killed at the gas station. Mofield told those present that he and the others were riding through Wilson Park and that they started shooting when they saw some people from Wilson, and that he had chased and shot one of the people there. In his statement, Smith said that Harrison had a PPX9 handgun, Mofield had a .9 Taurus pistol, and Appellant had a .38 revolver. Smith also identified Mofield as the individual seen in video footage of the shooting exiting the vehicle and running after someone. N.T. 6/14/2023, at 39-64.

Smith testified that Appellant was part of the 31st Street gang. Philadelphia Officer Christopher Lai, who was familiar with the conflict between 27th Street and 31st Street, also recognized Appellant as someone associated with 31st Street. Officer Lai noted that an Instagram account belonging to Appellant had a username which referenced 31st Street. On October 21, 2017, Appellant was arrested in possession of a gun which had been used by a 31st Street gang members three (3) days earlier. On April 20, 2020, Appellant was shot while in a stolen Volkswagen with three (3) other 31st Street gang members. Three (3) firearms were recovered from the scene of this shooting, including one which was found close to where Appellant exited

25

the Volkswagen after being shot. Cell phone records for devices belonging to Appellant, Mofield, and Harrison showed communications between the three (3) of them. N.T. 6/13/2023, at 69-81, 103-116; N.T. 6/14/2023, at 6-23; N.T. 6/15/2023, at 102-110; N.T. 6/16/2023, at 78-88.

A recorded prison call made by Harrison indicated that Appellant and Mofield, who Harrison called his "young killers," were with him on the day the shooting occurred. Additionally, call detail records for the devices belonging to Appellant, Mofield, and Harrison showed no call activities at the time the shooting take place, but numerous calls both before and after. Cell phone location data was consistent with Harrison and Mofield being at the gas station at the time of the shooting. Appellant was not excluded as a contributor of DNA collected from a book bag and hooded sweatshirt found at the scene of the shooting. Sixteen (16) 9mm Luger fired cartridge casings and five (5) bullet specimens were recovered from the scene of the shooting. An intact bullet and a bullet jacket were determined to be from the .38 or 9mm family of caliber. N.T. 6/15/2023, at 38-50, 67-72, 90-102; N.T. 6/16/2023, at 89-127.

The evidence, viewed in the light most favorable to the Commonwealth as verdict winner, established that Appellant was a known member of the 31st Street gang, along with Yameen Mofield and Khalid Harrison. Additionally, Nyseem Smith's testimony, along with evidence presented regarding Appellant's 2017 arrest and the 2020 incident in which he was shot while in a stolen vehicle, established that Appellant was a participant in the ongoing conflict between 31st Street and 27th Street. As part of this conflict, members of the 31st Street gang would drive through 27th Street territory looking to shoot anyone associated with 27th Street, which included individuals from Wilson Park. Smith's statement regarding the homicide of R.B. established that R.B., K.B., and Q.B. were initially targeted because the shooters recognized that they were associated with Wilson Park.

26

The shooters who targeted and struck R.B., K.B., and Q.B. – all of whom were minors – exhibited clear malice. The shooters drove up to the gas station where R.B., K.B., and Q.B. were hanging out and immediately began shooting at them, having recognized their association with a rival gang. Based on the number of fired cartridge casings recovered from the crime scene, the shooters fired at least sixteen (16) gunshots at the group of teenagers. One of the shooters even exited the vehicle and chased one of the teenagers while firing gunshots at him. In committing the shooting, the shooters exhibited an extreme indifference to the value of human life and a conscious disregard of the unjustified and extremely high risk of serious bodily harm that could result from firing a high volume of gunshots at a group of several teenagers. As a result of those actions, R.B., K.B., and Q.B. were all struck by gunfire. R.B. died from his gunshot wound, while K.B. and Q.B. were injured by gunfire and placed in danger of serious bodily injury.

Smith identified Appellant as one of the shooters, along with Mofield and Harrison, and stated that Appellant was carrying a .38 revolver on the night of the homicide. Evidence placed Appellant and Harrison together on the day of the homicide and Harrison and Mofield at the gas station at the time of the homicide. Cell phone records showed that phones belonging to Appellant, Mofield, and Harrison were all inactive around the time the homicide occurred, despite being active both before and after. Appellant was not excluded as a contributor of DNA found on items recovered by police following the homicide. The record also reflects that at least two (2) pieces of ballistic evidence were determined to possibly originate from a .38 caliber firearm, the exact type of firearm that Appellant was carrying according to Smith. Even though only two (2) individuals were identified as shooters in the video footage, there was sufficient circumstantial evidence to conclude that in the light most favorable to the Commonwealth as the verdict winner, there was a third shooter not captured by the video footage.

27

There was therefore sufficient evidence for a jury to conclude that to find that Appellant was one of the three (3) shooters who maliciously shot at a group of teenagers standing at a gas station, killing R.B., and was therefore guilty of Murder of the Third Degree. Moreover, by acting with malice, Appellant also exhibited the same *mens rea* required to sustain his two (2) convictions for Aggravated Assault. Appellant's actions in maliciously firing at a group of teenagers at a gas station constituted, at a minimum, an attempt to cause serious bodily injury to both K.B. and Q.B.

Additionally, there was sufficient evidence to conclude that Appellant, Mofield, and Harrison targeted R.B., K.B., and Q.B. because of an ongoing shooting conflict between the 31st Street and 27th Street gangs. By committing the shooting, Appellant, Mofield, and Harrison all committed overt acts in furtherance of their shared goal to bring harm to those associated with 27th Street. There was thus sufficient evidence to find Appellant guilty of both Conspiracy to Commit Murder of the Third Degree and Conspiracy to Commit Murder. Accordingly, even accepting Appellant's argument that there were only two (2) shooters and that Appellant was not one of them, there would still be sufficient evidence to find Appellant guilty of Murder of the Third Degree under a theory of conspiratorial liability. R.B.'s death was a natural and probable result of a conspiracy designed to fire gunshots at anyone associated with 27th Street.

The term "firearm" is defined in 18 Pa.C.S.A. § 6102 as "[a]ny pistol or revolver with a barrel less than 15 inches . . . or any pistol, revolver, rifle or shotgun with an overall length of less than 26 inches." It is well settled that the testimony of a witness that the defendant possessed a firearm is sufficient to establish a violation of the Uniform Firearms Act, even if a weapon is never actually recovered. *See, e.g., Commonwealth v. Robinson*, 817 A.2d 1153, 1161–62 (Pa. Super. 2003).

28

A person violates 18 Pa.C.S.A. § 6106 of the Uniform Firearms Act if he "carries a firearm concealed on or about his person . . . without a valid and lawfully issued license." A person violates 18 Pa.C.S.A. § 6108 of the Uniform Firearms Act if he carries a "firearm, rifle or shotgun at any time upon the public streets or upon any public property" in Philadelphia, unless he is licensed to do so or exempt from licensing. Both statutes thus require an element of possession, which "can be found by proving actual possession, constructive possession, or joint constructive possession." *Commonwealth v. Heidler*, 741 A.2d 213, 215 (Pa. Super. 1999). A person is guilty of Possessing Instruments of Crime if "he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. § 907(a). A gun is clearly defined as an instrument of crime as contemplated by 18 Pa.C.S.A. § 907(a). *See Commonwealth v. Monroe*, 422 A.2d 193, 195 (Pa. Super. 1980).

The record reflects that an analysis of ballistic evidence revealed that at least two 9mm (2) firearms were used in the shooting of R.B., K.B., and Q.B. at the gas station on 2435 West Passyunk Avenue on October 4, 2018. This analysis also showed that an intact bullet and a bullet jacket recovered from the scene were also from either .38 or 9mm family of caliber, indicating a .38 revolver could have been used in the shooting. Nyseem Smith, who knew Appellant as a fellow member of the 31st Street gang, gave a statement to police in which he identified Appellant as one of the gas station shooters and specified that Appellant carried a .38 revolver. The Commonwealth and counsel for Appellant stipulated that Appellant did not have a valid license to carry a concealed weapon. N.T. 6/14/2023, at 45-64; N.T. 6/15/2023, at 38-53; N.T. 6/20/2023, at 26.

The evidence, viewed in the light most favorable to the Commonwealth as verdict winner, thus established that Appellant used a .38 revolver, a firearm within the definition of 18

Pa.C.S.A. § 6102, to shoot at R.B., K.B., and Q.B. As Appellant did not have a valid license to carry a firearm at the time of the shooting, there was sufficient evidence to convict him of VUFA § 6106. The shooting occurred after a vehicle pulled up to a gas station at 2435 West Passyunk Avenue in Philadelphia, committed the shooting, and promptly left the scene. As Appellant thus carried a firearm without a license throughout Philadelphia on the way to and from the shooting, there was sufficient evidence to convict him of VUFA § 6108. Lastly, because the firearm used by Appellant constituted an instrument of crime that was employed criminally in the shooting, there was also sufficient evidence to convict Appellant of PIC. Appellant's sufficiency of the evidence claim is therefore without merit and no relief is due.

**II.    The jury's verdict finding Appellant guilty of Murder of the Third Degree and other related offenses was not against the weight of the evidence.**

Appellant next claims that the jury's verdict was against the weight of the evidence. Appellant advances the same arguments in support of this claim, asserting that the only evidence implicating him in the murder of R.B. and the shooting of K.B. and Q.B. came from a cooperating witness and that forensic evidence was incompatible with this witness's statement that Appellant used a .38 caliber revolver in the shooting. Appellant thus argues that the jury's verdict cannot stand where three (3) individuals were convicted yet there was only evidence of two (2) shooters. Appellant's second claim is also without merit and no relief is due.

Pennsylvania law regarding appellate review of weight of the evidence claims is well settled. A claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Widmer,* 744 A.2d 745, 751-752 (Pa. 2000). In reviewing a challenge to the weight of the evidence, the trial court may only grant relief "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail."

30

*Commonwealth v. Rivera*, 283 A.3d 482, 497-498 (Pa. Super. 2020) (quoting *Commonwealth v. Jacoby*, 170 A.3d 1065, 1080 (Pa. 2017)). In determining if the verdict is against the weight of the evidence, the trial court does not "sit as the thirteenth juror" but instead must find that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (2013) (quoting *Widmer*, 744 A.2d at 752).

A true weight of the evidence challenge "concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Commonwealth v. Thompson*, 106 A.3d 742, 758 (Pa. Super. 2014). The finder of fact is "free to believe all, none, or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Clemens*, 242 A.3d 659, 667 (Pa. Super. 2020). Reversal of a trial court verdict should therefore only be granted where the evidence is so "tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Akhmedov*, 216 A.3d 307, 326 (Pa. Super. 2019). A jury's verdict "shocks the judicial conscience" when it "causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench." *Id.* (quoting *Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa. Super. 2004)).

As the finder of fact in Appellant's case, it was the function of the jury to evaluate the evidence and determine the weight it should be given. The Commonwealth presented twenty-two (22) witnesses as part of its case-in-chief against Appellant and his co-defendant, Yameen Mofield. The jury evidently weighed this testimony and evidence in such a manner as to find Appellant guilty of Murder of the Third Degree, Conspiracy to Commit Murder of the Third Degree, Conspiracy to Commit Murder, Aggravated Assault, VUFA § 6106, VUFA § 6108, and PIC in relation to his role in the murder of R.B. and shooting of K.B. and Q.B. Appellant filed

31

post-sentence motions following his sentencing in which he argued that the jury's verdict was against the weight of the evidence. After a review of the testimony and evidence presented at trial, this Court denied Appellant's post-sentence motions without a hearing.

In denying Appellant's post-sentence motions, this Court properly concluded that the jury's verdict did not shock the judicial conscience and was adequately supported by the weight of the evidence. As this Court has explained and Appellant now concedes in challenging the weight of the evidence, there was sufficient evidence for the jury to convict Appellant of Murder of the Third Degree and related offenses. Furthermore, despite Appellant's contentions otherwise, the Commonwealth presented compelling testimony and evidence supporting Appellant's guilt. Accordingly, the testimony and evidence presented at trial was not so "tenuous, vague and uncertain" such that the jury's verdict shocked the conscience of this Court.

Appellant contends that the only evidence implicating him in the murder of R.B. and the shooting of K.B. and Q.B. came from Nyseem Smith, a member of the 31st Street gang who agreed to cooperate with police in exchange for a favorable prison sentence. Smith, who had been arrested in connection with a triple shooting that occurred in August 2018 on the 1600 block of Marston Street, ultimately decided to cooperate with police and gave a series of statements to police in which he revealed details of shootings that the 31st Street gang was involved in. N.T. 6/14/2023, at 31-35, 95-96, 104-118.

Smith gave a statement regarding the murder of R.B. Smith told police that he was at his cousin's house when the gas station shooting occurred but that Appellant, Yameen Mofield, Khalid Harrison, and Markell Davis came to the house after the shooting. Appellant, Mofield, and Harrison told Smith and others present that somebody had been shot and killed at the gas station. Mofield told those present that he and the others were riding through Wilson Park and

32

that they started shooting when they saw some people from Wilson, and that he had chased and shot one of the people there. In his statement, Smith said that Harrison had a PPX9 handgun, Mofield had a .9 Taurus pistol, and Appellant had a .38 revolver. Smith also identified Mofield as the individual seen in video footage of the shooting exiting the vehicle and running after someone. *Id.* at 39-64.

Before closing instructions were given to the jury, this Court and Appellant's counsel discussed what jury instruction would be appropriate to explain to the jury how it should consider Smith's testimony. N.T. 6/20/2023, at 5-12. This Court and Appellant's counsel ultimately agreed that Pennsylvania Suggested Standard Criminal Jury Instruction 4.06 would be given along with a modified version of Pennsylvania Suggested Standard Criminal Jury Instruction 4.01 with the term "accomplice" removed. *Id.* at 11-12. The latter instruction informs the jury that a particular witness is "a corrupt and polluted source whose testimony should be viewed with great caution." *Commonwealth v. Wholaver*, 177 A.3d 136, 165 (Pa. 2018) (quoting *Commonwealth v. Smith*, 17 A.2d 873, 906 (Pa. 2011). The instruction is designed to specifically address situations where a witness testifies to obtain favorable treatment. *Smith*, 17 A.3d at 906. The law "presumes that the jury will follow the instructions of the court." *Commonwealth v. Brown*, 786 A.2d 961, 971 (Pa. 2001).

This Court instructed the jury how to properly "consider and weigh" the testimony and evidence which had been presented and offered several factors to be used in that determination, including whether the witness had "any interest in the outcome of the case." N.T. 6/20/2023, at 181. Subsequently, this Court issued the following instruction to the jury regarding the testimony of Nyseem Smith:

33

Now, I need to give you some further instructions. And this has to do with Nyseem Smith's testimony. Nyseem Smith cooperated with the Commonwealth in return for resolving his criminal cases. Experience shows that a cooperator when caught on other criminal matters may often try to place the blame falsely on someone else. In other words, a cooperator may be a perfectly truthful witness. The special rules I will give you are meant to help you distinguish between truthful and false testimony by a cooperating witness. These are special rules that apply.

First, you should view the testimony of a cooperator with disfavor because it comes from a corrupt and polluted source. Second, you should examine the testimony of a cooperator closely and accept it only with care and caution. Third, you should consider whether the testimony of a cooperator is supported in whole or in part by other evidence. A cooperator's testimony is more dependable if supported by independent evidence. However, even if there is no independent evidence supporting independent evidence, you may still find the defendant guilty solely on the basis of the cooperator's testimony if after using the special rules I just told you about, you are satisfied beyond a reasonable doubt that the cooperator testified truthfully and that the defendant is guilty.

*Id.* at 211-212.

As the jury is presumed to have followed this Court's instructions, it was thus properly instructed to view Nyseem Smith's testimony of Floyd with disfavor, care, and caution because he was a "corrupt and polluted source" due to his status as a cooperator. The jury was specifically instructed to consider whether Smith's testimony was supported by independent evidence. The jury was advised that it was permitted to convict Appellant solely based on Smith's testimony if, even after utilizing these instructions, it was satisfied beyond a reasonable doubt that Smith testified truthfully, and that Appellant was guilty. Accordingly, the jury's decision to convict Appellant of Murder of the Third Degree and related offenses would have been proper even if it was made solely on the basis of Smith's testimony implicating Appellant.

Appellant argues that Smith's testimony was the only evidence implicating him in the murder of R.B. and the shooting of K.B. and Q.B. but contends that forensic evidence was incompatible with Smith's version of events. Smith stated that Appellant used a .38 caliber revolver in the shooting, but Appellant argues that forensic evidence indicated that there were

34

only two (2) shooters who used separate 9mm handguns. Appellant contends that these two (2) shooters were Yameen Mofield and Khalid Harrison. This Court disagrees with Appellant's conclusions regarding the evidence presented at his trial.

Contrary to Appellant's assertion that the only ballistic evidence recovered was from two (2) separate 9mm handguns, the record reflects that at least two (2) pieces of ballistic evidence were determined to possibly originate from a .38 caliber firearm, the exact type of firearm that Appellant was carrying according to Smith. N.T. 6/15/2023, at 38-53. Furthermore, the video footage of the shooting did not specifically rule out the possibility of there being more than two (2) shooters. No driver could be seen in the video footage, yet it can be inferred from the circumstances of the vehicle driving to the gas station and leaving after the shooting that there was a driver. Accordingly, it is reasonable to conclude that there was a third shooter unseen in video footage which was taken from only specific angles in low lighting conditions. Regardless, even accepting Appellant's contentions, the jury's verdict finding Appellant guilty of Murder of the Third Degree would not be against the weight of the evidence if it determined that he was a co-conspirator with the two (2) shooters.

Additionally, the jury's verdict was not against the weight of the evidence because the Commonwealth presented other evidence which corroborated key aspects of the statement that Nyseem Smith gave to police regarding the homicide of R.B. Video footage from the shooting showed an individual exiting the shooting vehicle and chasing after one of the shooting victims. In his statement, Smith said he had seen a video of the shooting and was able to identify this individual as Yameen Mofield. Dean Fosque gave a statement to police in December 2018 in which he said that Mofield had committed a murder at a gas station on Passyunk a few months prior. Fosque told detectives that he learned this from Mofield himself, who was trying to sell a

35

stolen car so that he could have money to leave town. Mofield told Fosque that he was the individual chasing a boy in the video footage. N.T. 6/12/2023, at 90-106, 109-113, 120-124, 134-137, 153-164; N.T. 6/13/2023, at 7-12, 30-46; N.T. 6/14/2023, at 45-64.

On the day after the shooting, while police were executing a search warrant at Mofield's residence on an unrelated matter, Mofield's mother asked Mofield if he had anything to do with what happened at the gas station the day before, suggesting that she suspected that Mofield may have been involved in the homicide of R.B. Smith told police that a PPX9 used in the homicide had also been used in a triple shooting at Marston Street just a couple months earlier. A ballistic crosscheck was conducted based on this information and revealed that fired cartridge casings recovered from the gas station matched those recovered from Marston Street. N.T. 6/13/2023, at 15-18, 61-88; N.T. 6/14/2023, at 45-64; N.T. 6/15/2023, at 82-90.

Smith told police that Appellant, Mofield, Khalid Harrison, and a fourth individual came to Smith's cousin's house after the homicide and shared details with those present about what had occurred. Smith later identified the fourth individual as Markell Grasty. Police reviewed an extraction of Grasty's cell phone and found videos in which he and Mofield were together. Police also found communications between Grasty and Mofield using call detail records for Grasty's cell phone and determined that Grasty followed both Appellant and Harrison on Instagram. Communications were also found between cell phones associated with Appellant, Mofield, and Harrison, who were all identified as 31st Street gang members. N.T. 6/13/2023, 61-88; N.T. 6/14/2023, at 39-64; N.T. 6/16/2023, at 78-88.

Call detail records for the phones associated with Appellant, Mofield, and Harrison, showed that no calls were placed around the time the shooting at the gas station occurred, but that all phones were active both before the shooting and afterward. Cell site analysis, which was

only able to be conducted on the phones belonging to Mofield and Harrison, showed that around ten (10) minutes after the shooting, Mofield's phone utilized a cell tower pointing in the direction of the shooting. Additionally, Harrison's phone utilized a cell tower pointing in the direction of the shooting about thirty (30) minutes prior to the shooting. On the morning of the shooting while he was in South Philadelphia, Harrison made a recorded call to a state prison in which he stated that he was with his "young killers" Appellant and Mofield. N.T. 6/16/2023, 108-122.

Smith told police that Mofield said to the group present at Smith's cousin's house that he had dropped his phone at the scene of the shooting. Tymeir Shands, who was part of that group, was recorded on a prison call ten (10) days after the shooting saying that Mofield was on the run because of his involvement in the gas station shooting. Shands also said in this call that Mofield had said that he dropped his phone there. Police did not find a phone associated with Mofield at the scene and call detail records for Mofield's phone indicated that it was used to place calls after the shooting. Accordingly, even though there was no evidence that Mofield actually dropped his phone, both Smith and Shands independently and consistently stated that Mofield believed he had dropped a phone after committing the shooting. There was evidence, however, that Mofield did go on the run and was ultimately apprehended in Georgia. N.T. 6/14/2023, at 45-64; N.T. 6/15/2023, at 90-102, 111-113, 126-127; 6/16/2023, at 130-138; N.T. 6/20/2023, at 17-23.

Furthermore, the Commonwealth presented evidence which corroborated other statements Nyseem Smith gave regarding 31st Street gang-related shootings. Smith gave a statement regarding an August 2018 triple shooting on Marston Street that he was involved in. Smith provided details which were previously unknown to police, including the involvement of a second vehicle and the identities of the other shooters. Police were able to confirm the presence of this second vehicle upon reviewing video footage from the incident and were also able to use

cell phone location data to confirm movement consistent with the information Smith provided in his statement. N.T. 6/15/2023, at 142-149.

Accordingly, the Commonwealth presented evidence which demonstrated that Smith had given accurate and previously unknown information in his statements to police and testified truthfully in compliance with his cooperation agreement. The cumulative evidence presented at trial indicated that Appellant was involved in the murder of R.B. and the shooting of K.B. and Q.B. The Commonwealth thus presented compelling testimony and evidence supporting Appellant's guilt, such that the jury's verdicts finding Appellant guilty of Murder of the Third Degree and related charges were adequately supported by the weight of the evidence. Appellant's weight of the evidence challenge is therefore without merit and no relief is due.

III. **This Court properly granted both of the Commonwealth's motions *in limine* to admit other acts evidence.**

Appellant's third claim is that this Court erred when it granted the Commonwealth's motions *in limine* to admit other acts evidence and subsequently admitted that evidence at trial. Appellant specifically challenges the admission of evidence relating to a shooting on August 8, 2018, and evidence that the firearm used in that shooting was recovered from Appellant. Appellant also challenges the admission of evidence relating to a shooting on April 22, 2020, in which Appellant was shot and three (3) firearms were ultimately recovered. Finally, Appellant challenges the admission of recorded prison calls from Markell Davis to Khalid Harrison on the morning of the homicide in which Davis referred to Appellant and Yameen Mofield, as "my young killers." Appellant's third claim is without merit and, accordingly, no relief is due.

The "admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion." *Commonwealth v. Reid*, 99 A.3d 470, 493 (Pa. 2014). An abuse of discretion "is not merely an

38

error of judgement," but occurs when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record." *Commonwealth v. Jackson*, 283 A.3d 814, 817 (Pa. Super. 2022) (quoting *Commonwealth v. Talley*, 236 A.3d 42, 55 (Pa. Super. 2020)).

To be admissible at trial, evidence must be relevant. Pa.R.E. 402. Evidence is relevant when it "has the tendency to make a fact more or less probable than it would be without the evidence," and said fact "is of consequence in determining the action." *Jackson*, 283 A.3d at 817 (citing Pa.R.E. 401(a)-(b)). Evidence is also relevant "if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding a material fact." *Id.* at 817-818 (quoting *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. Super. 2002)). A court may exclude relevant evidence if its probative value is outweighed by a danger of unfair prejudice. Pa.R.E. 403.

Evidence of "any other crime, wrong, or act is not admissible to prove a person's character" to show that the person acted in conformity with those other acts on a particular occasion or to show the person's propensity to commit crimes. Pa.R.E. 404(b)(1); *see also Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1283 (Pa. Super. 2004). This type of evidence may, however, "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). Such evidence may also be admissible under the "*res gestae*" or "complete story" exception where the evidence is "part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts." *Commonwealth v. Lark*, 543 A.2d 491, 497 (Pa. 1988).

Additionally, in a criminal case, other acts evidence offered for a permissible purpose is admissible "only if the probative value of the evidence outweighs its potential for unfair prejudice." *Id.* Unfair prejudice has been defined as a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Commonwealth v. Tyson*, 119 A.3d 353, 360 (Pa. Super. 2015). Evidence will not be prohibited merely because it is harmful to a defendant but instead only where the evidence is "so prejudicial that it would inflame the jury to make a decision based on something other than the legal propositions relevant to the case." *Commonwealth v. Talbert*, 129 A.3d 536, 539 (Pa. Super. 2015). A trial court is "not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration." *Commonwealth v. Gad*, 190 A.3d 600, 605 (Pa. Super. 2018) (quoting *Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa. 2014)). A trial court may nonetheless offer a cautionary jury instruction to ameliorate the prejudicial effect of other acts evidence. *See Talbert*, 129 A.3d at 539.

On March 16, 2023, the Commonwealth filed a motion *in limine* to admit other acts, specifically seeking the admission of evidence relating to the shootings on August 8, 2018, and April 22, 2020. On March 29, 2023, the Commonwealth filed a second motion *in limine* to admit other acts, seeking to admit recorded prison phone calls made by Markell Davis. As will be explained below, this Court properly granted both of the Commonwealth's motions *in limine*.

a. This Court properly exercised its discretion in granting the Commonwealth's first motion *in limine* to admit other acts and allowing evidence relating to shootings which occurred on August 8, 2018, and April 22, 2020, to be admitted at trial.

Appellant contends that this Court erred when it granted the Commonwealth's first motion *in limine* to admit other acts evidence relating to shootings which occurred on August 8, 2018, and April 22, 2020. This Court allowed this evidence based on a finding that it was

40

relevant to proving motive and telling a complete story of an ongoing conspiracy between the warring rival 27th Street and 31st Street gangs. Furthermore, although this Court found that the probative value of this evidence outweighed its potential for unfair prejudice, cautionary instructions were nonetheless given to the jury to ameliorate any prejudicial effects the evidence of these shootings might have had. Accordingly, this Court properly exercised its discretion in granting the Commonwealth's first motion *in limine* and no relief is due on this claim.

On March 16, 2023, the Commonwealth filed a motion *in limine* to admit other acts in which it sought to introduce evidence of "continued and sustained violence between warring gangs." The Commonwealth first sought to admit evidence which established that Appellant and Yameen Mofield were both associated with the 31st Street gang. The Commonwealth additionally sought to admit two (2) shootings which it contended showed a "continued and sustained pattern of gun violence" perpetrated by the 31st Street gang against the rival 27th Street gang leading up to the murder of R.B. The Commonwealth argued that these shootings were relevant to proving the motive, intent, plan, absence of mistake, and natural development of the facts in Appellant's case.

The first shooting, which occurred on October 18, 2017, involved four (4) members of the 31st Street gang who jumped from behind parked vehicles and shot J.W.H., a known member of the 27th Street gang, thirteen (13) times while he was riding his bicycle down South Etting Street. Three (3) days later, police observed Appellant throwing a firearm under a vehicle, which was recovered and later determined to have been used in the Etting Street shooting. The Commonwealth clarified that Appellant was not personally involved in this shooting, but that this sequence of events showed that members of the 31st Street gang shared firearms and thus provided an example of the common scheme used by the gang.

41

The second shooting, which occurred on April 22, 2020, at 5300 Greenway Avenue, involved Appellant and three (3) other individuals who were sitting in a stolen Volkswagen when a white Jeep pulled alongside and began firing into the Volkswagen. While Appellant and another individual exited through the rear driver side passenger door, a black handgun fell to the ground. This handgun, a black 9mm loaded with sixteen (16) rounds and a fired cartridge casing in the chamber, was later recovered. Appellant was shot but managed to hobble into a nearby corner store. The Commonwealth submitted that this shooting was evidence of a common scheme or plan utilized by both the 27th and 31st Street gangs in "back and forth shootings between the two groups."

On March 23, 2023, Appellant's counsel submitted a memorandum of law in opposition to the Commonwealth's motion *in limine*. Appellant argued that under the holding of *Commonwealth v. Holt*, 273 A.3d 514 (Pa. 2022), evidence that Appellant possessed a firearm on a prior occasion would only be admissible where the same firearm was used in the instant offense. Appellant asserted that both the firearm recovered from Appellant on October 21, 2017, and the black 9mm which fell out of the vehicle on April 22, 2020, were in police possession at the time of R.B. was killed and therefore could not have been used in the commission of the homicide. Appellant thus argued that evidence regarding either shooting ought to be precluded at trial. Appellant also objected to allegations regarding his association with the 31st Street gang.

On March 24, 2023, this Court held a hearing to decide the Commonwealth's motion *in limine* to admit other acts. The Commonwealth reiterated that the other acts evidence it sought to introduce would explain the common plan and scheme utilized by the 31st Street gang and the motive for why fifteen-year-old R.B. was targeted and murdered while at a gas station. N.T. 3/24/2023, at 6-8, 12-13. The Commonwealth argued that other acts evidence would show that

42

R.B. had appeared in rap videos where he promoted 27th Street and that Appellant and Mofield were affiliated with the rival 31st Street gang. *Id.* at 9-27. The Commonwealth stated that the evidence showed the existence of an ongoing conspiracy by members of the 31st Street gang to "shoot and kill as many people from 27th Street as possible." *Id.* at 18-20. The Commonwealth argued that introducing other acts evidence regarding gang activity, connections within the gang, and the existence of an ongoing conspiracy was thus necessary to allow the trier of fact to fully understand the context of R.B.'s murder. *Id.* at 21-28.

In response, counsel for Appellant first argued that information regarding Appellant's affiliation with a gang was "in and of itself prejudicial." *Id.* at 29-30. Appellant's counsel further argued that evidence of shootings committed by other members of that gang was "extremely prejudicial," particularly given that Appellant was not charged with being involved in those shootings. *Id.* at 30-31. Appellant's counsel argued that the other acts evidence the Commonwealth sought to admit was propensity evidence in that it would imply to a jury that Appellant was someone who goes out shooting based solely on his association with a gang that commits shootings. *Id.* at 31.

Appellant's counsel also challenged that the first shooting the Commonwealth sought to admit evidence of occurred nearly a year before the homicide of R.B., while the second shooting occurred a year-and-a-half after it. *Id.* at 31-34. Appellant's counsel noted that neither of these shootings involved Appellant and that there was no evidence to suggest that the firearms used in those shootings were used in the homicide of R.B. *Id.* at 31-35. Accordingly, Appellant's counsel argued that these shootings were not relevant to the homicide and that evidence regarding the firearms used in the shootings would be inadmissible. *Id.*

43

Counsel for Mofield similarly argued that the two (2) shootings were too remote in time relative to the murder of R.B. *Id.* at 42-43. Mofield's counsel expressed concern with where to "draw the line" given the number of incidents which had been attributed to the 31st Street gang and argued that the information presented to the jury should be limited to what took place the day of R.B.'s homicide as much as possible. *Id.* at 42-45. Finally, Mofield's counsel indicated that he would not be opposed to the use of a curative instruction to establish the history between the 27th Street and 31st Street gangs. *Id.* at 45-46.

The Commonwealth argued in response to counsel for Appellant and Mofield that it was not seeking to admit other acts evidence under a theory of access to weapons, but because the evidence stablished a common plan, scheme, and design. *Id.* at 47-48. The Commonwealth then detailed the "signature way" in which the 31st Street gang commits murders demonstrated by the other acts evidence: the gang would steal a car, have multiple individuals in the car, rotate the weapons used, go into possible 27th Street gang territory, commit shootings from either outside the car or within the car, then leave in the car. *Id.* at 48. Finally, the Commonwealth emphasized that the other acts evidence was not too remote in time and was instead part of a series of ongoing incidents occurring continuously from 2017 to 2020. *Id.* at 49.

On March 30, 2023, this Court issued its ruling, stating that Appellant's case involved two warring gangs and that evidence of gang association would explain the motive behind the murder of R.B. and provide completeness of the story by showing the 31st Street gang's "modus operandi of stealing cars, using them in shootings, trading multiple guns, and doing random shootings essentially when they see people." N.T. 3/30/2023, at 10-11. Additionally, this Court found that the evidence the Commonwealth sought to admit was indicative of an ongoing conspiracy involving shooting and warring between the 27th Street and 31st Street gangs and

44

that the evidence would establish Appellant and Mofield's connections to the 31st Street gang. *Id.* at 11-12.

Accordingly, this Court held that the evidence was highly relevant and that its probative value outweighed its prejudicial effect. *Id.* at 12. In support of its ruling, this Court cited previous Pennsylvania cases which upheld the admission of evidence about the operations of the Junior Black Mafia and the associations of different individuals with that gang. *Id.* at 12-13. This Court concluded that the two (2) shootings from 2018 and 2020 were ongoing conduct that was part of the conspiracy by 31st Street gang members to attack 27th Street gang members and vice versa. *Id.* at 14-15. This ongoing course of conduct eventually resulted in the killing of R.B. on October 4, 2018. *Id.* at 15. Finally, this Court stated that although it was not necessary to sanitize the evidence of the shootings for the jury, it would nonetheless issue cautionary instructions to explain to the jury how to properly consider that evidence. *Id.* at 12, 15.

This Court properly exercised its discretion in granting the Commonwealth's motion *in limine* to admit other acts and allowing evidence relating to two (2) shootings which occurred on August 8, 2018, and April 22, 2020, to be admitted at Appellant's trial. As a threshold matter, evidence regarding these two (2) shootings was relevant. The first shooting involved members of the 31st Street gang shooting a member of the 27th Street gang thirteen (13). Appellant was later found in possession of the firearm used in that shooting, but he was not alleged to have participated in the shooting himself. The second shooting involved members of the 31st Street gang, including Appellant, getting shot at while sitting in a stolen vehicle by members of the 27th Street gang. Appellant, who was affiliated with the 31st Street gang, was charged with murder and related offenses for his alleged involvement in the homicide of R.B., who was affiliated with the 27th Street gang. Accordingly, the evidence the Commonwealth sought to

45

admit regarding an ongoing war between the 31st Street and 27th Street gangs was extremely relevant to R.B.'s homicide in that it provided important context for why R.B. was targeted.

Additionally, the evidence regarding these two (2) shootings was not offered by the Commonwealth to show Appellant's access to firearms or his propensity to commit crimes. Although Appellant was found in possession of a firearm used in the first shooting, the Commonwealth specifically noted that Appellant was not personally involved in the shooting itself. Furthermore, Appellant was a victim of the second shooting, which was perpetrated by members of the 27th Street gang. While a handgun fell from the Volkswagen that Appellant was in during the shooting, the Commonwealth did not attempt to prove that this was Appellant's handgun. Accordingly, as Appellant's counsel stated, there was no evidence to suggest that firearms used in either shooting was used to commit the murder of R.B.

The evidence of the two (2) shootings was instead relevant to proving the motive for why R.B. was targeted and killed. This evidence illustrated that there was an ongoing conspiracy by members of the 27th Street and 31st Street gangs to continuously shoot at and war with each other. Within its motion *in limine*, the Commonwealth also detailed evidence it sought to admit establishing Appellant and Mofield's associations with the 31st Street gang. The Commonwealth also argued at the motion hearing before this Court that there was evidence to show that R.B. had appeared in rap videos where he promoted the rival 27th Street gang. Accordingly, the evidence of the two (2) shootings was relevant to proving that Appellant and Mofield, who were both connected to the 31st Street gang, had a motive to shoot and kill R.B. based on his connection to the rival 27th Street gang.

Additionally, the evidence of the two (2) shootings provided the complete story of the sequence of events both leading up to and following R.B.'s homicide. As this Court explained

when granting the Commonwealth's motion *in limine*, the other acts evidence provided fuller background on the modus operandi used by the 31st Street gang. The evidence of the two (2) shootings demonstrated how the gang had an established pattern of stealing cars, using them in shootings, trading guns, and using those guns for shootings upon randomly encountering members of the 27th Street gang. As the circumstances of R.B.'s murder closely matched the modus operandi of the 31st Street gang, the other acts evidence of the two (2) shootings was part of a greater sequence of events between the warring 27th Street and 31st Street gangs that R.B.'s murder was intrinsically linked to.

In reaching its ruling on the admissibility of the other acts of the two (2) shootings, this Court looked to two (2) Supreme Court of Pennsylvania court involving the Junior Black Mafia for support. In *Commonwealth v. Jones*, the Supreme Court upheld a trial court's decision to allow evidence concerning the Junior Black Mafia's structure and activities and the defendant's involvement and relationship with the Junior Black Mafia on the basis that this evidence was admissible to prove the motive for the victim's murder and the existence of a criminal conspiracy. 668 A.2d 491, 502 (Pa. 1995). In *Commonwealth v. Reid*, the Supreme Court upheld a trial court's decision to allow testimony regarding the defendant's connection with the Junior Black Mafia because it was evidence that was admissible to prove motive and conspiracy and its probative value outweighed any implication of prior criminal activity. 642 A.2d 453, 461 (Pa. 1994). This Court properly found these cases to be analogous to Appellant's case, as evidence of Appellant's connection to the 31st Street gang was admissible to prove the motive to kill R.B. as well as the complete story of the ongoing conspiracy between the warring rival 27th Street and 31st Street gangs.

47

The evidence of the two (2) shootings was undoubtedly prejudicial to Appellant in establishing his connection to the 31st Street gang and his participation in gang-related activities. Nonetheless, the probative value of the evidence in establishing motive and providing the complete story forming the events surrounding R██ B████'s murder outweighed its potential for unfair prejudice. Moreover, this Court was not required to sanitize unpleasant facts about Appellant from the jury's consideration. Nevertheless, to prevent the jury from potentially analyzing this evidence in an unduly prejudicial manner, this Court stated after granting the Commonwealth's motion that it would be willing to offer a curative instruction to the jury.

During closing instructions to the jury at Appellant's trial, this Court instructed the jury as follows:

> You have heard testimony about what we call Other Acts, sometimes Prior Bad Acts. You are not to consider that testimony for showing any criminal tendencies by the defendants but only for the purpose of showing motive in this case. So you are to consider it only for that very limited purpose.

N.T. 6/20/2023, at 220. This instruction was sufficient to ameliorate any prejudicial effects of the other acts evidence introduced by the Commonwealth. Accordingly, this Court properly exercised its discretion in granting the Commonwealth's first motion *in limine* to admit other acts evidence and no relief is due.

b. This Court properly exercised its discretion in granting the Commonwealth's second motion *in limine* to admit other acts and allowing the admission of a recorded prison that took place on the morning of the murder of R.B.

Appellant also contends that this Court erred when it granted the Commonwealth's second motion *in limine* to admit other acts evidence of a recorded prison call between Markell Davis and Khalid Harrison. In this call, made on the morning of the murder of R.B., Harrison stated that he was with Appellant and Yameen Mofield and referred to them as his "young killers." This Court allowed this evidence because it was relevant to proving Appellant's identity

48

and the intent of the 31st Street gang's intent to shoot and war with the rival 27th Street gang as part of an ongoing conspiracy. Accordingly, this Court properly exercised its discretion in granting the Commonwealth's second motion *in limine* and no relief is due on this claim.

On March 29, 2023, the Commonwealth filed a second motion *in limine* to admit other acts. In its motion, the Commonwealth sought the admission of two (2) recorded prison phone calls made by Markell Davis while he was incarcerated at SCI Smithfield. This Court addressed the Commonwealth's second motion *in limine* at a motion hearing held on March 30, 2023. At this hearing, the Commonwealth stated that the first phone call it sought to admit was placed on October 4, 2018, to Khalid Harrison, who pled guilty to his involvement in the murder of R.B. N.T. 3/30/2023, at 22. The Commonwealth additionally stated that the second call it sought to admit was placed on October 14, 2018, to Tymier Shands, who was with Naseem Smith at the time that Appellant, Yameen Mofield, and others discussed details of the murder of R.B. *Id.* at 22-24.

In the first recorded call, which was placed at 11:42 a.m. on October 4, 2018, the day of the murder, the following exchange between Harrison ("H") and Davis ("D") occurred:

D: Where you at now yo?
H: Out Tasker.
D: The fuck is you doing out there its 11 something in the morning, it it it ain't even 12 o'clock the fuck you out there for?

. . .

D: Not that jawn. Who you with?
H: I'm with my young killers, nah sike my young gorillas, my young savages.

. . .

H: I'm with my youngings though, I'm with Susu and Nunu, ain't that some shit?
D: No you're not.
H: Yes I am

. . .

D: Crazy man damn that shit is crazy, they growing up right before my eyes man.

H: Mmmm they are out here doing big things.

Comm. Exhibit 173.

The Commonwealth clarified at the motion hearing that the nickname "Susu" referred to Mofield and that the nickname "Nunu" referred to Appellant. N.T. 3/30/2023, at 23. The Commonwealth argued that it would present cell phone evidence that Mofield was with Harrison at the time of this call, and that the call was relevant because it was evidence that placed them together hours before the murder of R██ B███. *Id.* The Commonwealth also argued that the content of the phone call, including the reference to "young killers," further supported the notion that there was an ongoing conspiracy for members of the 31st Street Gang to be looking for 27th Street Gang members. *Id.* Appellant's counsel opposed the admission of this call, arguing that it was not made in furtherance of any conspiracy. *Id.* at 42-45. This Court held its decision under advisement until it had an opportunity to carefully review the transcripts of the call. *Id.* at 45.

On June 16, 2023, while Appellant's trial was ongoing, Appellant's counsel renewed his objection to the admission of the recorded prison call, arguing that it was questionable it was made in the course of or in furtherance of a conspiracy. N.T. 6/16/2023, at 39. Appellant's counsel also objected on the basis that the call was extremely prejudicial and that there would be no opportunity to cross-examine anyone speaking and no one to identify who was speaking on the call. *Id.* In response, the Commonwealth argued that the call was made by a co-conspirator, Harrison, in the course of a conspiracy and that it had an analyst who could testify that the phone number used was associated with Harrison. *Id.* at 39-40.

Thereafter, this Court held that it would allow the call to be admitted and played for the jury, but only on the condition that it was verified by someone who could acknowledge and recognize voices on the call. *Id.* at 41. The Commonwealth explained that it had an analyst who

could recognize the voices based on hours of listening to recoded calls. *Id.* Amanda McCourtie, who was qualified as an expert in cell site analysis, cell phone extraction and analysis, and social media extraction and analysis, testified that she was the one who discovered the first recorded prison call, which was made by Khalid Harrison to Markell Davis, an inmate at a state prison. Ms. McCourtie was able to recognize Harrison's voice on the recorded call, which was then played for the jury. *Id.* at 122-127.

This Court properly exercised its discretion in granting the Commonwealth's motion *in limine* to admit other acts and allowing the recorded prison phone call between Markell Davis and Khalid Harrison to be admitted into evidence. This call was relevant to the murder of R.B., as it was made mere hours before the murder occurred and involved Harrison, who pled guilty to his involvement in the murder. In the call, Harrison stated that he was Appellant and Yameen Mofield, placing the three (3) of them together on the day of the murder. The phone call was thus highly relevant to proving Appellant's connection to Harrison and Mofield and his involvement in the murder of R.B.

As this Court previously stated, the evidence presented by the Commonwealth in its first motion *in limine* to admit other acts established that there was an ongoing conspiracy by members of the 27th Street and 31st Street gangs to continuously shoot at and war with each other. The recorded prison call constituted further evidence relevant to proving Appellant's identity as a member of the 31st Street gang and the intent of the 31st Street gang. In the call, Harrison stated that he was out on Tasker Street with Appellant and Mofield, indicating they were in 31st Street gang territory. Harrison also stated that Appellant and Mofield were "out here doing big things," establishing their connection to the activities of the 31st Street gang. Harrison

references 31st Street gang's intent to shoot and war with the rival 27th Street gang by referring to Appellant and Mofield as his "young killers" and "young savages."

Furthermore, the recorded prison call helped provide a complete story of the hours leading up to the murder of R.B. Cell phone location data and Instagram messages, both of which were ultimately presented at Appellant's trial, verified Harrison's statement on the phone call that he was in the area of Tasker Street with Appellant and Mofield on the morning of the murder. The recorded prison call was thus part of the sequence of events which became part of the history of the case and formed part of the natural development of the facts. The prejudicial effects of the call, including its reference to Appellant as one of Harrison's "young killers," were outweighed by its probative value in establishing identity and intent and providing the complete story of the sequence of events leading up to the murder of R.B. Accordingly, this Court properly exercised its discretion in granting the Commonwealth's second motion *in limine* to admit other acts evidence and no relief is due.

## IV. This Court properly denied Appellant's motion for a mistrial following Khalid Harrison's refusal to answer the Commonwealth's questions.

Appellant's final claim is that this Court erred by not granting a mistrial after the Commonwealth called Khalid Harrison to testify and he refused to answer any questions put to him. Appellant represents that the Commonwealth improperly read directly from Harrison's statement in which he allegedly inculpated Appellant in the shooting of Q.B. A mistrial was not warranted under the circumstances where the Commonwealth permissibly asked Harrison leading questions because he was a hostile witness. Furthermore, although the Commonwealth's questions did not constitute evidence, this Court nonetheless mitigated any prejudicial effects of those questions by striking Harrison's appearance and testimony from the record and issuing

52

curative instructions to the jury. Accordingly, Appellant's final claim is also without merit and no relief is due.

It is well-settled that the review of a trial court's denial of a motion for a mistrial is "limited to determining whether the trial court abused its discretion." *Commonwealth v. Chamberlain*, 30 A.3d 381, 422 (Pa. 2011). An abuse of discretion is not merely an error of judgment, "but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will . . . discretion is abused." *Commonwealth v. Brooker*, 103 A.3d 325, 332 (Pa. Super. 2014). It is "within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial." *Commonwealth v. Leap*, 222 A.3d 386, 391–392 (Pa. Super. 2019) (quoting *Commonwealth v. Caldwell*, 117 A.3d 763, 774 (Pa. Super. 2015)). The trial court is "in the best position to gauge potential bias and deference is due the trial court when the grounds for the mistrial relate to jury prejudice" because it has "had the opportunity to observe the jurors, the witnesses, and the attorneys and evaluate the scope of the prejudice." *Commonwealth v. Walker*, 954 A.2d 1249, 1256 (Pa. Super. 2008).

"A mistrial is an extreme remedy that is appropriate only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Leap*, 222 A.3d at 392 (quoting *Commonwealth v. Bryant*, 67 A.3d 716, 728 (Pa. 2013)). Pursuant to Pennsylvania Rule of Criminal Procedure 605(B), a trial court "may declare a mistrial only for reasons of manifest necessity." Pa.R.Crim.P. 605(B). A trial court's "failure to consider if there are less drastic alternatives to a mistrial creates doubt about the propriety of the exercise of the trial judge's discretion" because "it indicates that the court failed to properly consider the defendant's

significant interest in whether or not to take the case from the jury." *Walker*, 954 A.2d at 1254-1255 (quoting *Commonwealth v. Kelly*, 797 A.2d 925, 936-937 (Pa. Super. 2002)).

Prosecutorial misconduct includes actions "intentionally designed to provoke the defendant into moving for a mistrial or conduct by the prosecution intentionally undertaken to prejudice the defendant to the point where he has been denied a fair trial." *Commonwealth v. Chmiel*, 777 A.2d 459, 464 (Pa. Super. 2001). Prosecutorial misconduct is not grounds for a mistrial unless the "unavoidable effect" of the prosecutor's actions was to "prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. LaCava*, 666 A.2d 221, 231 (Pa. 1995).

It is "well settled in the law that attorneys' statements or questions at trial are not evidence." *Id.* (quoting *Commonwealth v. Green*, 581 A.2d 544, 562 (Pa. 1990)). Generally, "[l]eading questions should not be used on the direct or redirect examination of a witness except as may be necessary to develop the witness' testimony." Pa.R.E. 611(c). When a party calls a hostile witness, however, interrogation may be conducted using leading questions. *Id.* A witness may be treated as hostile by the party calling him "where the testimony of the witness is unexpected, contradictory to earlier statements, and harmful to the party calling the witness, and where an injustice would result if the request to treat the witness as hostile is denied." *Commonwealth v. Bibbs*, 970 A.2d 440, 453 (Pa. Super. 2009).

When a trial court gives adequate cautionary instructions to the jury it is not necessary for the judge to declare a mistrial. *Leap*, 222 A.3d at 392. The law "presumes that the jury will follow the instructions of the court." *Commonwealth v. Brown*, 786 A.2d 961, 971 (Pa. 2001).

54

The Commonwealth called Khalid Harrison to testify on the fifth day of Appellant and Yameen Mofield's jury trial. Prior to being sworn in, Harrison stated "I ain't participating in this. I don't know why I'm here. I got my deal, I don't know why I'm here." N.T. 6/16/2023, at 4-5. After being sworn in, the Commonwealth asked Harrison a series of questions in which he responded only by saying "non content." *Id.* at 5-6. This Court then confirmed with Harrison that he had spoken with an attorney prior to being called to testify. *Id.* at 6. Harrison explained again that he didn't want to be there, stating "it's not my choice; I go my deal, I'm doing my time. I'm not here for that." *Id.* The Commonwealth asked Harrison if he got his deal for the murder of R.B. and if he had murdered R.B. with Appellant and Yameen Mofield. After Harrison refused to answer any of these questions, this Court excused the jury from the courtroom. *Id.* at 7.

After a sidebar discussion held off the record, this Court allowed the jury to return to the courtroom and permitted the Commonwealth to continue its direct examination of Harrison. *Id.* at 15-16. Harrison continued to only say "non content" in response to the Commonwealth's questions, although the Commonwealth noted on the record at several points that Harrison had raised his eyebrows or smiled. *Id.* at 16-18. This Court then granted the Commonwealth's request to show Harrison a copy of a statement he had given to police in March 2018. *Id.* at 18-19. The Commonwealth asked Harrison if it was right that he had given a statement to police "talking all about 31st Street and 27th Street." *Id.* at 19. After Harrison failed to answer the question, the Commonwealth announced its intention to read a question from the statement itself. *Id.* This Court overruled Appellant's counsel's objection. *Id.* at 20.

The Commonwealth subsequently read out the following portion of Harrison's statement on the record:

Q: Why do you think you were set up?
A: There are three hoods that I'm beefing with. Well not just me, but my hood.

55

**Q:** What hood is yours?
**A:** 31st and Tasker.
**Q:** What are the hoods that you're having trouble with?
**A:** Wilson Projects, 23rd and Croskey, and 27th and Tasker.
**Q:** Is there any reason why specifically you would be targeted?
**A:** There is five of us in our main little crew . . . so Mar and my face out there.

*Id.* The Commonwealth then asked Harrison if it was correct that he had already told the police about 31st and Tasker in that statement from March 2018. *Id.* The Commonwealth then moved on and asked Harrison about the circumstances that led him to take a plea deal for his involvement in R.B.'s homicide. *Id.* at 21. The Commonwealth asked Harrison about a prison call he had made in which he "called Omar Davis and told him that [he] was driving around, out in Tasker with Nu-Nu and Su-Su." *Id.* at 21-22. The Commonwealth also asked Harrison about how he had called Nu-Nu and Su-Su, referring to Appellant and Yameen Mofield, his "young killers," "young gorillas," and "young savages" who were "out there doing big things." *Id.* at 22.

Harrison did not verbally reply to any of the Commonwealth's questions regarding the statement or prison call. *Id.* at 19-22. Thereafter, the Commonwealth asked this Court to declare Harrison a hostile witness. *Id.* at 22. This Court did so, stating there was "no question about that." Counsel for Appellant and Mofield next objected to the Commonwealth's request to play an exhibit for Harrison. *Id.* at 23. Following another sidebar conversation held off the record, this Court asked Harrison if he was refusing to answer any of the Commonwealth's questions. After Harrison answered affirmatively, stating "I'm not answering no questions," the jury was again excused from the courtroom. *Id.* at 23-24. This Court then advised Harrison that he could be held in criminal contempt for his refusal to testify and explained the potential consequences were he to be found in contempt. *Id.* at 24-26. Harrison confirmed that he understood but was still refusing to testify. *Id.* at 26.

56

The Commonwealth subsequently moved for Appellant to be held in contempt. *Id.* at 26. This Court found Harrison in direct criminal contempt for his repeated refusal to testify. *Id.* at 27. This Court held a brief sentencing hearing and ultimately sentenced Harrison to a term of six (6) to twelve (12) months of confinement, to be served consecutively to his current term of incarceration. *Id.* at 27-29.

Appellant's counsel made a motion for a mistrial based on what had occurred during Harrison's testimony. *Id.* at 32. Counsel specifically objected not to his failure to answer questions but the Commonwealth's decision to read portions of Harrison's statement into the record. *Id.* Appellant's counsel explained that Harrison never acknowledged that it was his statement and that it was improper for him to be confronted with an "alleged inconsistent statement." *Id.* Appellant's counsel also took specific issue with how the Commonwealth asked Harrison if he pled guilty to the murder of R.B. with Appellant and Yameen Mofield. Appellant's counsel suggested that, at a minimum, Harrison's testimony be struck from the record but expressed concern with the jury's ability to "put out of [its] head" what it had heard from the Commonwealth while Harrison was on the witness stand. *Id.* at 33.

In response, the Commonwealth argued that it was permitted to ask Harrison leading questions because he had been declared a hostile witness. *Id.* at 34. The Commonwealth also asserted that it was entitled to ask Harrison about his guilty plea for his involvement in the murder of R.B. since he mentioned it. *Id.* The Commonwealth clarified that the statement it confronted Harrison with was taken from an incident unrelated to the murder of R.B. and that it moved onto another subject when it was clear that Harrison was unwilling to answer any of the Commonwealth's questions. *Id.* at 34-35. Finally, the Commonwealth argued that its questions did not constitute evidence and that the jury had already been instructed as such. *Id.* at 35.

57

This Court held that it was going to strike all of Harrison's testimony from the record, including both questions and any type of answer that Harrison provided. *Id.* This Court additionally stated its intention to repeat certain jury instructions given at the beginning at the trial, which would remind the jury that statements made by counsel and questions put to witnesses by counsel are not evidence. *Id.* at 35-36. This Court stated that it would also give final instructions to the jury instructing them to follow this Court's instructions and to not consider "the testimony or anything connected to Nyheem Khalid Harrison's appearance in court." *Id.* at 36-37. Accordingly, this Court denied Appellant's counsel's motion for a mistrial, concluded that these proposed remedies would be sufficient to cure any prejudicial effects of Harrison's testimony and that a mistrial was therefore not warranted. *Id.* at 37-38.

After a second Commonwealth witness, Tymeir Shands, similarly refused to testify, this Court subsequently instructed the jury as follows:

> Ladies and gentlemen, I'm going to give you certain instructions, and you need to follow those instructions like I told you before in the beginning and will tell you in the end.

> The testimony or the appearance – I'm going to put it this way, the appearance of Nyheem Khalid Harrison; anything that was asked of him and any kind of response he gave is going to be stricken from the record. You are not to consider that at all.

> . . .

> And I am just going to remind you of what I told you before, that it's my responsibility to decide all questions of law during the trial, and you must follow my rulings and instructions on the matters of law whether or not you agree with [them]. . . .

> . . .

> I also gave you another instruction before we started that statements made by counsel are not evidence, the questions that counsel puts to the witnesses are not evidence. It is the answers to those questions by the witness that provide the evidence for you. You should not speculate or guess that a fact may be true merely

58

because one of the lawyers asked the question which assumes or suggests that a fact is true.

So I'm reminding you of what I said before, and I again will mention in my closing instructions: The questions put to Mr. Harrison and whatever answers were gleaned are not to be considered in any way.

*Id.* at 49-50.

Additionally, in its closing instructions to the jury, this Court stated:

There were two witnesses; Nyheem Khalid Harrison and Tymier Shands, who refused to testify. I told you previously to completely disregard any questions or answers. And I am again instructing you to completely disregard any questions and any responses given by these witnesses. I remind you, as I've said before, that questions asked by counsel are not evidence. It is only the answers by the witness that provides the evidence for you. You are to disregard their testimony as I told you before.

N.T. 6/20/2023, at 213-214.

Appellant claims that this Court erred by not granting a mistrial following Khalid Harrison's refusal to answer the Commonwealth's questions, specifically challenging the Commonwealth's decision to read directly from a statement that Harrison gave to police. Appellant inaccurately contends that Harrison inculpated Appellant in the shooting of Q.B. in this statement. The statement that the Commonwealth quoted when questioning Harrison was taken in March 2018, whereas the murder of R.B. and shooting of Q.B. took place several months later in October 2018. In the March 2018 statement, which was taken after Harrison had been shot in the foot, Harrison explained that he was from 31st and Tasker and that he was having trouble with other neighborhoods, including Wilson Projects, 23rd and Croskey, and 27th and Tasker. Nowhere in this statement did Harrison mention Appellant, nor was this statement connected to the shooting of Q.B.

The record reflects that the Commonwealth did, however, ask Harrison about a plea deal he took for his involvement in the murder of R.B. and that the Commonwealth asked if he

59

murdered R.B. with Appellant and Yameen Mofield. N.T. 6/16/2023, at 6-7. Additionally, the Commonwealth asked Harrison if he took a plea deal because of an incriminating call he made to a prison. *Id.* at 21. The Commonwealth asked Harrison if he called Omar Davis and told him that he was driving around on Tasker with Appellant and Mofield, and if he referred to Appellant and Mofield as his "young killers," "young gorillas," and "young savages" who "were out there doing big things" on that call. *Id.* at 22. While questioning Harrison about the contents of the call, the Commonwealth notably did not mention that the call was made on the date that R.B. was murdered and Q.B. was shot.

Accordingly, the Commonwealth's questions did not reveal to the jury the full context of either the statement Harrison gave to police in March 2018, or the incriminating call Harrison made on the day of the murder. The questions were offered in response to Harrison's admission on the witness stand that he had taken a plea deal and was serving his time on that case. As Harrison was unwilling to answer any of the Commonwealth's questions to the extent that he was found guilty by this Court of criminal contempt, this Court appropriately allowed the Commonwealth to treat Harrison as a hostile witness. Accordingly, the Commonwealth was permitted to ask leading questions based on Harrison's plea deal, March 2018 statement, and phone call to Davis during its direct examination. Although the Commonwealth's questions were based on evidence, it is well settled that the questions themselves do not constitute evidence.

Nevertheless, this Court took appropriate actions to mitigate any prejudicial effects of the nature of the Commonwealth's questions. This Court struck the entirety of Harrison's appearance during the trial from the record, including both the Commonwealth's questions to him and his verbal and non-verbal responses. Following Harrison's dismissal from the witness stand, this Court instructed the jury that it was not to consider anything that transpired while

60

Harrison was on the stand. This Court also instructed the jury, as it had done at the beginning of Appellant's trial, that statements and questions made by counsel are not evidence and that it should not assume a fact to be true because a lawyer asked a question which assumed or suggested that fact was true. During closing instructions, this Court again instructed the jury that it was to "completely disregard" any questions or answers given during Harrison's refusal to testify and that questions asked by counsel were not evidence.

As juries are presumed to follow instructions given by this Court, it may be presumed that the jury disregarded anything that happened while Harrison was on the witness stand and that it did not improperly find any evidentiary value in the content of any of the Commonwealth's questions to Harrison. Accordingly, by striking Harrison's refusal to testify from the record and issuing curative instructions to the jury, this Court obviated the need to declare a mistrial. Such an extreme remedy was inappropriate where the jury was properly instructed on how to weigh evidence fairly and no actions were undertaken by the Commonwealth that prejudiced Appellant to the point of denying him a fair trial. Despite Appellant's contentions otherwise, this Court thus properly denied Appellant's motion for a mistrial. Appellant's final claim is therefore without merit and no relief is due.

## Conclusion

In summary, this Court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Appellant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

By the Court:

5/15/24

Date

HONORABLE CHARLES A. EHRLICH

61